966 So.2d 111 (2007)
STATE of Louisiana, Appellee
v.
Bryan Clayton ROBERTS, Appellant.
No. 42,417-KA.
Court of Appeal of Louisiana, Second Circuit.
September 19, 2007.
*113 Louisiana Appellate Project, by Mark O. Foster, for Appellant.
Paul J. Carmouche, District Attorney, Geya Williams Prudhomme, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before PEATROSS, DREW & LOLLEY, JJ.
PEATROSS, J.
Defendant, Bryan Clayton Roberts, was convicted by a jury of molestation of a juvenile, in violation of La. R.S. 14:81.2. The trial court found Defendant to be a third-felony habitual offender and sentenced him to 20 years at hard labor without benefit of probation, parole or suspension of sentence. Defendant now appeals. For the reasons stated herein, Defendant's conviction is affirmed and his sentence is amended and, as amended, is affirmed.

FACTS
Defendant was convicted of molesting J.O., the eight-year-old daughter of his girlfriend, L.O. On the night of January 20, 2005, L.O. was wondering why it was taking Defendant, her live-in boyfriend of three years, so long to come to bed, and she decided to get something to drink from the kitchen. As she walked through the *114 living room on her way to the kitchen, L.O. saw Defendant sitting on the couch next to J.O., who was sleeping. L.O. saw Defendant moving his hand away from between J.O.'s legs. When he realized L.O. was there, Defendant jumped up suddenly and moved in front of the window. L.O. asked Defendant what he was doing; Defendant said that he was covering J.O. because she looked cold. L.O. saw that J.O. was uncovered from below the waist and told Defendant that he did not do a good job of covering J.O. Defendant then "got up" in L.O.'s face, acted very angry, and asked L.O. what she thought he was doing to his daughter.[1] The record indicates that Defendant had been physically abusive to L.O. in the past and, for this reason, L.O. was afraid and decided to act as if nothing was wrong. L.O. testified that she did not sleep any that night because Defendant's defensive behavior made her wonder if he had been sexually abusing her daughter.
The next morning as L.O. was getting J.O. ready for school, L.O. asked J.O. if anyone had been "messing with her in an inappropriate way or making her feel uncomfortable by touching her." J.O. told L.O. that she could not tell because he would hurt them if she told; L.O. told J.O. that she could fix it. After five minutes of crying, J.O. told L.O. that "daddy has been messing with my private area." J.O. told L.O. that Defendant had been touching her on her private parts; that sometimes it hurt when he did this; that he would put his fingers inside her and tell her that this is the way that daddies show their love for their children; that he made her put his private part in her mouth and ask her to lick it; that he kissed her private part with his lips and tongue; and that he told her that no one would believe her if she told anyone and that he would kill her mother if she told. L.O. told J.O. that she was going to go to the school that day, but that J.O. should tell someone at school what Defendant had done in case she did not make it there.
That same morning, L.O. told Defendant that she had a meeting at the school. Defendant told L.O. that he wanted to go with her, but L.O. told him she did not need him to go with her. Defendant became angry and pushed L.O. on the couch, but then agreed to let her go to the school without him. As L.O. left the house, Defendant threw the vacuum cleaner over the balcony towards her, followed her into the yard and yelled obscenities at her in front of the neighbors. Defendant followed L.O. as she walked to the school and threatened to blow up the school and hurt the children if she did not come home with him. He also threatened to beat up anyone who came between them and threatened that, if the police came to arrest him, he would make sure that they killed him. L.O. told him that he could come back to the school at noon to walk her home if he was worried about the safety of the neighborhood, and Defendant agreed to this. L.O. waited for Defendant to walk around the corner, then she went inside and told the school secretary and principal about what Defendant had been doing to J.O., about Defendant's physical abuse towards her and about the threats he made in regard to the school.
School officials contacted Shreveport Police, and Detective Paula Moreno responded to the call. L.O. told Det. Moreno what happened, and Det. Moreno took L.O., J.O. and J.O.'s twin brother to the YWCA shelter. Later, Det. Moreno transported them *115 to the Gingerbread House for an interview. L.O. denied that she coached J.O. on what to say during the interview, and she testified that she had no further contact with Defendant after that day. J.O. testified at trial that she went to the Gingerbread House, and the video tape of her interview was played before the jury. The girl testified that she knew the difference between true and false and that she was telling the truth in the interview. On cross-examination, J.O. testified that someone else had touched her private parts, but that it happened after Defendant did it. J.O. also denied making up the allegations in order to get Defendant out of the house.
The video tape of the interview showed J.O. talking with the interviewer, Latonya Hocker of the Gingerbread House, who began by asking her some introductory questions. J.O. told the interviewer that she lived with her mom, dad and her twin brother, but that she did not live with her dad now because he messed with her and touched her private part. J.O. indicated on a drawing that the area between her legs was the area which she considered to be her private part. J.O. said that Defendant had touched her private part with his hands, on top of her clothes and on one occasion while she was playing in her mom and dad's room after her brother left the room. J.O. stated that Defendant had done this four or five times. J.O. said the first time it happened was while she was at her Uncle Tommy's house with Defendant and her brother; her mother and Uncle Tommy had gone to court because he was trying to get his children back. J.O. said that she was six years old when this happened and that Defendant touched her between her legs, inside her clothes. She remembered that it was daytime and cold outside during this particular incident. J.O. said it happened again in her bedroom at their old house and that Defendant touched her inside her clothes and between her legs. She stated that this happened more than once in her mom's and dad's room and that it happened one time in the kitchen, but that Defendant touched her outside her clothes then. She further stated that it happened in her bedroom. J.O. said that Defendant did not touch the inside of her body, and Defendant told her not to tell anyone or he would kill her. J.O. admitted that she told her mom and that her mom told her to tell the school.
In addition, J.O. related that one time Defendant got on top of her and "humped" her while her mom was watching a movie; J.O. said that she was wearing her clothes, but that his private part was touching her private part. J.O. demonstrated what Defendant did to her with two toy bears. She indicated on a diagram that Defendant's penis was his private part and said that, once, Defendant showed her his private part in the kitchen and said "the f-word." J.O. said that Defendant called his private part a "pecker" and that he had put his pecker on her private part when she was wearing clothes, but that he was not wearing clothes at the time. She explained that Defendant wanted her to touch his pecker, but that he did not make her touch it. J.O. said that Defendant bit her private part while she was asleep and her mom had noticed a bite mark on her private part when getting her ready for school. J.O. said that Defendant put his pecker on her buttocks, on the outside of their clothes, and that they both were wearing clothes at the time. J.O. also said that Defendant put his tongue in her mouth. At the end of the interview, the interviewer asked J.O. if her mother told her to say anything and J.O. said that her mother told her to tell the truth. The interviewer asked if Det. Moreno told her to say anything, and J.O. said that the lady with the badge did not tell her anything. The interviewer asked J.O. if she had *116 made up any of what she said during the interview, and J.O. said that she did not make up anything.
Det. Moreno testified that she watched the interview on a closed-circuit television as it was being conducted and that the interviewer wore an "ear bug" so that she could talk to her directly, suggest questions or let her know if they could not understand what was being said. Det. Moreno testified as to what she saw during the interview and testified that J.O.'s demeanor seemed calm. She related that, when listening to such an interview, she listens to see if the child is able to give specific details and the way in which the child describes things in order to make sure that the child has not been led to say something or that the child is not repeating something she heard from adults. Det. Moreno further testified that J.O.'s words appeared to be her own and that she did not see any signs of J.O. being "coached" to make these allegations. According to Det. Moreno, J.O.'s statement in the interview was consistent with what L.O. told her before the interview. Det. Moreno testified that there was no physical evidence of molestation found, but that sometimes there is no physical evidence when the crime does not involve penetration or enough physical contact to cause damage. Det. Moreno also testified that sometimes children heal so fast that there is no physical evidence by the time the doctor conducts a physical examination.
Defendant testified that he considered J.O. to be his daughter during the three years he was in a relationship with L.O. He denied touching J.O. inappropriately and denied having any physical or sexual desires for J.O. Defendant testified that he believed J.O. had been coerced to make the allegations and that J.O. and L.O. made up the allegations because of his physically abusive behavior towards L.O., which he conceded the children had observed. He further conceded on cross-examination that he had previously pleaded guilty to obscenity and to possession of Schedule II with intent to distribute. Defendant, however, also testified that he considered himself to be a law-abiding person. Based on the evidence presented at trial, as previously stated, the jury found Defendant guilty of molestation of a juvenile.

DISCUSSION
Assignment of Error Number One (verbatim): The evidence was insufficient to support the conviction.
Defendant argues that the State's evidence was insufficient to support his conviction for molestation of a juvenile.[2] On *117 the record before us, we find that the evidence presented by the State was sufficient to support Defendant's conviction for molestation of a juvenile.
The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, reviewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333. The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra. In the absence of internal contradictions or irreconcilable conflict with physical evidence, the testimony of one witness is sufficient support for a requisite factual conclusion if that witness is believed by the trier of fact. State v. Jones, 31,613 (La.App. 2d Cir.4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434, citing State v. Ford, 28,724 (La. App. 2d Cir.10/30/96), 682 So.2d 847, writ denied, 99-0210 (La.5/14/99), 745 So.2d 12.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of witnesses, the matter is one of the weight, not the sufficiency, of the evidence. State v. Allen, 36,180 (La.App. 2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566 and 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
According to La. R.S. 14:91.2(A), the offense of molestation of a juvenile is defined as follows:
Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where *118 there is an age difference of greater than two years between the two persons, with the intention of gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
The offender is subject to an increased penalty range pursuant to Subsection C if he or she commits molestation of a juvenile while having control or supervision of the juvenile victim. Thus, in order to determine whether the State presented sufficient evidence to support a conviction for molestation of a juvenile, this court must view the evidence in the light most favorable to the prosecution and examine whether any rational trier of fact could have found the essential elements of molestation of a juvenile were proven beyond a reasonable doubt.
Defendant testified that he was born August 31, 1979, and the victim was between the ages of six and seven years old when these incidents of sexual abuse occurred; thus, the State presented sufficient evidence to show that Defendant was over the age of seventeen, that the victim was under the age of seventeen and that the age difference was more than two years. The testimony of J.O. from the video described many lewd and lascivious acts committed upon her by Defendant. Defendant's specific intent to arouse or gratify his sexual desires need not be proven as a fact; rather, it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Hill, 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758, citing State v. Graham, 420 So.2d 1126 (La.1982); State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020. J.O. testified that Defendant threatened to kill her if she told anyone. This constitutes evidence that Defendant committed these acts through a threat of great bodily harm. Further, Defendant lived with them, J.O. called Defendant "daddy" and Defendant committed many of these lewd and lascivious acts while J.O. was in his care. These facts support the conclusion that Defendant accomplished these acts by use of influence by virtue of being in a position of control or supervision over J.O. Accordingly, we find that the State presented sufficient evidence to support Defendant's conviction for molestation of a juvenile.
This assignment is, therefore, without merit.
Assignment of Error Number Two (verbatim): The trial court erred in denying Mr. Roberts' motion in limine to exclude the video tape interview of the child victim from evidence.
Defendant argues that the trial court erred in denying his motion in limine, which allowed the State to present the video tape of the interview conducted with J.O. at the Gingerbread House. Defendant argues that the video should have been excluded because the interviewer asked leading questions and because the interviewer was not present at trial for cross-examination. Defendant argues that the State did not meet the procedural requirements of La. R.S. 15:440.1, et seq., which are necessary before admitting the video tape. Specifically, Defendant argues that the State failed to offer evidence that Det. Moreno supervised the interview and failed to call Latonya Hocker to testify because she was the actual person who conducted the interview. Defendant further argues that the State offered no proof that Det. Moreno was statutorily authorized or qualified to supervise the interview *119 or that she actually supervised the interview. Defendant argues that this deprived him of the right to meaningfully confront and cross-examine the person who actually conducted the interview or the person who actually supervised the interview. He further asserts that this deprived him of the opportunity to ask questions regarding the interviewer's education and qualifications, the supervisor's education and qualifications, whether Det. Moreno was familiar with procedures and protocol of the agency conducting the interview, the reasons for why certain questions were asked or whether Det. Moreno actually supervised the interviewer. Defendant maintains that Ms. Hocker was not unavailable because she had moved to Kentucky and he argues that the State did not want to incur the cost of producing her. Defendant asserts that the trial court agreed with the premise of his argument, but that it denied the motion in limine because he did not properly raise the argument that the statute was unconstitutional. Defendant asserts on appeal that he was never arguing that the statute was unconstitutional, but that the State did not comply with the statute by producing a properly qualified witness, which violated his confrontation right to cross-examine a competent witness to the hearsay evidence contained within the video tape.
The State argues that the tape was properly admitted under La. R.S. 15:440.1, et seq. It urges that some leading questions are allowed when dealing with child victims and that the trial court did not abuse its discretion in finding that the leading questions were permissible. The State further argues that the leading questions were harmless because Defendant had the opportunity to cross-examine the child. The State also submits that Det. Moreno was a proper witness because she is a police officer and that the training requirements to which Defendant refers only apply to personnel of the Department of Social Services according to the plain language of La. R.S. 15:440.4(B).
The trial court viewed the video tape and determined that, under the totality of the circumstances, the leading questions that were asked were permissible in order to get specific information. In regard to the absence of Ms. Hocker, the trial court opined that it thought the interviewer should be available for cross-examination, but that the statute did not require the State to present the interviewer. The trial court noted that Defendant had not followed the proper procedure for challenging the statute as unconstitutional. The trial court, therefore, denied the motion in limine on the ground that Det. Moreno's testimony as the officer supervising the interview was sufficient to comply with the requirements of the statute. We conclude that the trial court's ruling was proper.
In La. R.S. 15:440.1, et seq., the Louisiana Legislature declared that protected persons who were the victims of violent crime should not be subjected to more "intrusion" than necessary, so a hearsay exception was created to allow the video tape of an interview conducted with the victim to be presented as evidence at trial when the victim is 14 years of age or younger, when the victim has a developmental disability or when the victim has mental retardation. The method for recording the video tape and the competency of that evidence is explained in La. R.S. 15:440.4, as follows:
A. A videotape of a protected person may be offered in evidence for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
(1) That such electronic recording was voluntarily made by the protected person.

*120 (2) That no relative of the protected person was present in the room where the recording was made.
(3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.
(4) That the recording is accurate, has not been altered, and reflects what the protected person has said.
(5) That the taking of the protected person's statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a licensed professional counselor, or an authorized representative of the Department of Social Services.
B. The department shall develop and promulgate regulations on or before September 12, 1984, regarding training requirements and certification for department personnel designated in Paragraph (A)(5) of this Section who supervise the taking of the protected person's statement.
Further, the admissibility of the video tape is explained, in pertinent part, by La. R.S. 15:440.5, as follows:
A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
(1) No attorney for either party was present when the statement was made;
(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
(3) The recording is accurate, has not been altered and reflects what the witness or victim said;
(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
(5) Every voice on the recording is identified;
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;
(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and
(8) The protected person is available to testify.
B. The admission into evidence of the videotape of a protected person as authorized herein shall not preclude the prosecution from calling the protected person as a witness or from taking the protected person's testimony outside of the courtroom as authorized in R.S. 15:283. Nothing in this Section shall be construed to prohibit the defendant's right of confrontation.
Both La. R.S. 15:440.4(A)(3) and La. R.S. 15:440.5(A)(4) clearly prohibit questions leading the protected person from making a particular statement. The Louisiana Supreme Court, however, has found that the rule forbidding leading questions may "yield somewhat to the trial court's discretion in the examination of young victims." State v. Abbott, 29,497 (La.App. 2d Cir.6/18/97), 697 So.2d 636, writ denied, 97-1929 (La.1/9/98), 705 So.2d 1097, citing State v. Carthan, 377 So.2d 308 (La.1979). In State v. Watson, 39,362 (La.App. 2d Cir.4/20/05), 900 So.2d 325, this court explained that some leading questions do not render such video tapes inadmissible under these statutes:
With regard to leading questions, the court in State v. Feazell, 486 So.2d 327 (La.App. 3d Cir.1986), writ denied, 491 So.2d 20 (La.1986), considered the issue of the competency of a videotape of a child victim in which some leading questions *121 had been asked under LSA-R.S. 15:440.4. There, the court found:
Leading questions are ordinarily prohibited when propounded to one's own witness unless such witness is unwilling or hostile. LSA-R.S. 15:277. However, it is well settled that an exception is usually made when questioning a young child. State v. Kelly, 456 So.2d 642 (La.App. 2d Cir.1984), writ denied, 461 So.2d 312 (La.1984); State v. Kahey, 436 So.2d 475 (La. 1983); State v. Bolton, 408 So.2d 250 (La.1981); State v. Francis, 337 So.2d 487 (La.1976). Furthermore, notwithstanding the general rule against leading questions, the matter is largely within the discretion of the trial court and in the absence of palpable abuse of that discretion resulting in prejudice to the accused, a finding of reversible error is not warranted. State v. Kelly, supra; State v. Francis, supra.

The court in Feazell found that the leading nature of the questions constituted harmless error "especially since the defense viewed the videotape prior to trial and cross-examined the child during trial." In State v. Isaac, 544 So.2d 531 (La.App. 5th Cir.1989), the fifth circuit agreed with the analysis of the third circuit in State v. Feazell, supra, and extended that reasoning to include the issue of leading questions under LSA-R.S. 15:440.5 involving the admissibility of such videotapes. Since the defendant in that case cross-examined the child during the trial and viewed the videotape prior to trial, the court found that to whatever extent the questions of the interviewer were leading, the error was harmless. The court found no abuse of discretion on the part of the trial court in admitting the videotape into evidence. State v. Isaac, supra. See State v. Abbott, 29,497 (La.App. 2d Cir.6/18/97), 697 So.2d 636, writ denied, 97-1929 (La.1/9/98), 705 So.2d 1097.
Furthermore, some leading questions may be allowed when necessary to elicit particular details for purposes of clarifying the protected person's statement. In State v. Houston, 40,642 (La.App. 2d Cir.3/10/06), 925 So.2d 690, writ denied, 06-0796 (La.10/13/06), 939 So.2d 373, the defendant challenged the admissibility of a video tape of an interview with a child on the ground that the interviewer asked leading questions. The trial court asked the defendant for an example of a leading question; he proffered that if was improper for the interviewer to ask "Was he standing next to you or where was he?" because it suggested the child's answer, which was "standing next to me." On appeal, this court found that such questions did not render the video tape inadmissible because "[t]he explicit answers as well as much information given that did not originate with the interviewer show that this child was voluntarily testifying and was not misled or prompted to give responses." Id. In State v. Watson, supra, this court found that the trial court did not err in allowing the admission of the video tape interview of a child victim, despite leading questions, because the questions were for clarification purposes and were appropriate under the circumstances. See also State v. Guerra, 36,347 (La.App. 2d Cir.12/18/02), 834 So.2d 1206, writ denied, 03-0072 (La.4/25/03), 842 So.2d 398 (Trial court did not abuse discretion by admitting video tape interview, in spite of some leading questions, because the questions were appropriate under the circumstances, considering the child's age and the context of the interview, and there was no indication in the record that the child acquiesced to suggestive questions.).
In the case sub judice, when the trial court considered Defendant's motion *122 in limine to exclude the video tape on the basis of leading questions, the trial court viewed the video tape and determined that, under the totality of the circumstances, the leading questions that were asked were permissible in order to get specific details. Our review of the video tape shows that J.O. told the interviewer that she no longer lived with her "dad" because he had "messed with her" and had touched her private parts. The video tape shows that, when the interviewer asked J.O. about when this had happened, she gave detailed accounts about different occasions and places in which the abuse occurred. The interviewer asked J.O. leading questions as to whether Defendant touched her inside or outside of her clothes, but these questions do not appear to have suggested an answer because J.O. stated that it was inside her clothes on some occasions and outside her clothes on other occasions.
After J.O. told the interviewer that Defendant had shown his "pecker" to her, the interviewer asked her to describe what it looked like, and J.O. answered that it was round and white. Defendant argued that asking if it was white like skin or white like a piece of paper was improperly leading, but the context of the interview shows that the question was for clarification. The video tape indicates that J.O. was voluntarily testifying, that the information gathered in the interview originated with J.O. and that any leading questions asked were for purposes of clarification. Further, Defendant viewed the video tape before trial and J.O. was available for cross-examination at trial. Accordingly, the trial court did not abuse its discretion in finding that the video tape was admissible in spite of Defendant's objection to the leading questions.
Defendant also argues on appeal that the trial court erred in allowing the video tape because it did not present Ms. Hocker and because the State did not present evidence that Det. Moreno was actually supervising the interview or that she was qualified to do so. The trial court denied the motion in limine on the basis that Ms. Hocker was not present to testify because the statute allows either the person who conducted the interview or the person who supervised the interview to testify and because the State was presenting the testimony of Det. Moreno as the person who supervised the interview. Defendant did not argue at the trial level that the State failed to present evidence that Det. Moreno was the actual supervisor of the interview or that the State failed to present evidence that Det. Moreno was qualified to supervise the interview. Essentially, Defendant now argues that the State failed to present the proper foundation for Det. Moreno's testimony as the person who supervised the interview. This issue was not raised before the trial court, nor was it addressed by the trial court. Although Defendant alleges on appeal that his motion in limine preserves the issue for appellate review, our jurisprudence clearly holds that a new basis for an objection cannot be raised for the first time on appeal. State v. Sims, 40,300 (La. App. 2d Cir.10/26/05), 914 So.2d 594, citing La. C. Cr. P. art. 841; State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920 (La.App. 2d Cir.1987), writ denied, 505 So.2d 1139 (La.1987). Accordingly, this issue is not properly before this court.
We note, however, that Det. Moreno testified that she and another child protection agent watched the entire interview on a closed-circuit television from a separate room and that the interviewer was wearing an "ear bug" so that they could communicate with the interviewer to suggest questions or to let her know they could not hear what was being *123 said. La. R.S. 15:440.4(B) does not require law enforcement officials to be certified if they are supervising the taking of a child victim's statement; rather, the fifth circuit found that the "mandated training and certification" required of that statute only applied to personnel of the Department of Health and Human Resources. State v. Guidroz, 498 So.2d 108 (La.App. 5th Cir.1986). We find no merit to Defendant's contention that Det. Moreno did not actually supervise the interview or that she was not properly qualified to do so in accordance with the statute.
Although there is some discussion by trial counsel and the trial court regarding whether the statute violates Defendant's constitutional right to confront accusers by not requiring the interviewer to be available for cross-examination, Defendant does not pursue this claim on appeal. Rather, Defendant argues on appeal that the State failed to present a properly qualified witness by not having Ms. Hocker available for cross-examination and by Det. Moreno not being properly qualified to testify. We note that, in State v. Kennedy, 05-1981 (La.5/22/07), 957 So.2d 757, the Louisiana Supreme Court recently concluded that, where the declarant is present to appear for cross-examination, "the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Although this case does not address whether the absence of the interviewer's testimony adversely affects the defendant's confrontation rights, this case does illustrate that the core protection in the Sixth Amendment Confrontation Clause is the right to confront the accuser. The interviewer is not the accuser; the child victim making the statement is the accuser. The statute requires that either the interviewer or the person supervising the interview be available to testify or to be cross-examined by either party. La. R.S. 15:440.5(A)(6). This statutory requirement serves the purpose of having a witness who can authenticate the video tape, and it serves the purpose of having a witness to testify in regard to whether the process of recording and conducting the interview complied with the statutory requirements. Accordingly, the statute is constitutional in spite of allowing either the person who conducted the interview or the person who supervised the interview to testify or be available for cross-examination because the statute protects the defendant's confrontation rights by requiring the testimony of the child victim who made the statement.
This assignment is, therefore, without merit.
Error Patent
The trial court found Defendant to be a third-felony offender and sentenced him to 20 years at hard labor without benefit of probation, parole or suspension of sentence. According to La. R.S. 15:529.1(G), all habitual offender sentences are to be imposed without benefit of probation or suspension of sentence. Although La. R.S. 15:574.4(A)(1) states that "[a] person convicted of a third or subsequent felony offense shall not be eligible for parole," the Louisiana Supreme Court has consistently held that, when a defendant is sentenced under a statute that contains no prohibition of parole, the district court must sentence the defendant to a term that does not include such a prohibition because parole eligibility under La. R.S. 15:574.4 is to be determined by the Department of Corrections. St. Amant v.19th Judicial District Court, 94-0567 (La.9/3/96), 678 So.2d 536. Defendant's parole eligibility as a third habitual offender under La. R.S. 15:574.4 is a determination for the Department of Corrections to make. Defendant's sentence, therefore, is *124 amended to delete the denial of parole eligibility.

DECREE
For the foregoing reasons, the conviction of Defendant, Bryan Clayton Roberts, is affirmed. Defendant's sentence is amended to delete the denial of parole eligibility and, as amended, is affirmed.
CONVICTION AFFIRMED; SENTENCE AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] The record indicates that Defendant was not the biological father of J.O., but that J.O. called him "daddy."
[2] Counsel for Defendant did not make a separate argument for this assignment of error; but, in the argument regarding the denial of the motion in limine, counsel argues that the conviction was based solely upon hearsay evidence from the video taped interview with J.O. and that there was no other direct testimony regarding the offense. In the "ISSUES PRESENTED FOR REVIEW" section of the brief, counsel for defendant also states that the state relied on the hearsay evidence of the video and that this hearsay evidence was insufficient to support the conviction because it violated his right to fully confront and cross-examine all the witnesses. In this section of the brief, Defendant also notes that the interview contained improper leading questions and contradictory answers. The State argued that J.O.'s testimony via the video tape of the Gingerbread House interview, along with L.O.'s testimony regarding what she saw, was sufficient to support Defendant's conviction for molestation of a juvenile.

Assignments of error which are neither briefed nor argued are considered abandoned. U.R.C.A. 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. King, 41,084 (La.App. 2d Cir.6/30/06), 935 So.2d 815, writ denied, 06-1803 (La.2/16/07), 949 So.2d 411; State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990). Further, a mere statement of an assignment of error in a brief does not constitute briefing of the assignment; and, therefore, the assignment is deemed abandoned. State v. Lee, 39,969 (La.App. 2d Cir.8/17/05), 909 So.2d 672, writ denied, 06-0247 (La.9/1/06), 936 So.2d 195, citing State v. Toney, 26,711 (La.App. 2d Cir.3/1/95), 651 So.2d 387. Although the sufficiency argument appears to be abandoned because Defendant's brief contains no separate argument for it, the argument that can be gleaned from the entirety of the brief indicates that Defendant's sufficiency claim hinges on his premise that the video tape of J.O.'s Gingerbread House interview should not have been admitted. The admissibility of the video tape is addressed in Assignment of Error Number Two.