PEATROSS, J.
| defendant, John R. Thomas, was convicted of two counts of aggravated rape and two counts of molestation of a juvenile. Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence for each of the aggravated rape convictions, with the sentences to run concurrently. Defendant was sentenced to six years at hard labor for each of the molestation of a juvenile convictions, with the sentences to run concurrent to each other, but consecutive to the sentences for the aggravated rape convictions. Defendant now appeals. For the reasons stated herein, Defendant’s convictions and sentences are affirmed.

FACTS AND PROCEDURAL HISTORY

In 2004, Defendant met T.W.[1] at their mutual place of employment and the two began a romantic relationship. In less than a year, Defendant moved into T.W.’s home where she lived with her two minor children, J.B., her 8-year-old daughter, and X.B., her 7-year-old son. During this time, Defendant worked during daylight hours and T.W. worked nights, beginning around 4:00 p.m. and ending around 2:00 a.m. T.W. worked these hours seven days a week and was unable to be at the home with her children after their school day. As a single mother of two, she relied on the help of others for child care.
On her way to work every day, T.W. would drop off her children at the home of her friend, T.G. When Defendant finished his day shift, he would pick up T.W.’s children from T.G.’s house and take them back to the | ¿residence that he shared with T.W. where the children would remain under his supervision until she returned home from work. On many weekends, T.G.’s children accompanied T.W.’s children to their home with Defendant.
On December 3, 2004, at approximately 2:00 a.m., T.W. returned home from work, *1180 checked on her children and found her daughter, J.B., awake and crying. After being questioned by T.W., J.B. revealed that Defendant had “hurt” her. When T.W. asked J.B. to explain how Defendant hurt her, the child motioned toward her vaginal area. T.W. immediately confronted Defendant, who denied the allegations. Both T.W. and Defendant returned to the child’s room where, in the presence of both adults, J.B. reiterated the same accusation. T.W. told Defendant to leave their home and she spent the night in her daughter’s room.
That morning, T.W. took J.B. to LSU Hospital where she was examined by Dr. Farrah Huval. J.B., who was nervous and tearful at the time, told Dr. Huval that her mother’s boyfriend had placed “his privates” inside of her “privacy” and indicated her vaginal and anal areas. During the examination, Dr. Huval observed that J.B.’s vaginal opening was red, raw and had a yellow and brown discharge with a purulent odor. Suspecting that J.B. had contracted a sexually transmitted disease, Dr. Huval swabbed the area for testing and immediately placed the child on antibiotics. Testing from the swab indicated that J.B. had contracted Chlamydia, a sexually transmitted disease. On completing the examination, Dr. Huval contacted the Shreveport Police Department.
|sOn December 7, 2004, T.W. brought J.B. to the Gingerbread House, a local facility for evaluation of abused children. The recorded interview was conducted by Wendy Westerman; T.W. was not present in the room during the evaluation. Officer Simmie Brown of the Shreveport Police Department supervised the interview from a separate room and communicated with Ms. Westerman via a radio earpiece. On December 13, 2004, J.B. was treated at the Cara Center, a part of the local Christus Schumpert Health System, which offers physical exams of sexually and physically abused children. The results of this exam were normal.
Several days later, J.B. told her mother’s friend, T.G., about the alleged sexual abuse. Since her three daughters, A.G., C.G. and J.W., had spent a lot of time at T.W.’s home under Defendant’s supervision, T.G. questioned each one of them separately. All three girls indicated that Defendant had initiated contact with their vaginal areas while they were at T.W.’s home.
C.G., age 13, told her mother that Defendant had touched her vaginal area. A.G., age 8, told her mother that Defendant had put grease on her “private” and then inserted his penis into her vagina. J.W., age 6, told her mother that Defendant had put his hands inside her “private” in order to check if she was clean following her bath.
T.G. contacted Officer Brown to inform him of her three daughters’ allegations against Defendant. On January 7, 2005, T.G. brought A.G. to LSU Health Sciences Center (LSUHSC) where she received a physical examination. T.G. was informed by LSUHSC medical personnel that her ^daughter had been raped and that she had contracted the sexually transmitted diseases (STDs) Chlamydia and Gonorrhea. On January 11, 2005, all three girls were brought to the Gingerbread House for interviews. The recorded interviews were conducted by Gingerbread House personnel and supervised by Officer Brown.
On May 11, 2005, Defendant was charged by bill of indictment with the aggravated rapes of J.B. (d/o/b: 9/15/95) and A.G. (d/o/b: 9/12/96) and molestation of a juvenile against C.G. (d/o/b: 9/15/91) and J.W. (d/o/b: 2/16/98). Discovery motions were filed through 2005 and 2006. A jury trial in the matter commenced on June 17, 2008.
*1181 The State’s first witness, J.B., testified that she understood the difference between the truth and a lie. The State moved to introduce into evidence the videotaped interview of the child; and, overruling Defendant’s objections, the trial judge allowed the tape to be admitted and played for the jury.
During the videotaped interview, J.B. appeared visibly upset, rarely made eye contact and spoke softly, oftentimes inaudibly. When asked if she knew why she was there, J.B. shook her head no. J.B. stated that her mother’s friend John “put his privates” inside her “privacy.” J.B. indicated that this had happened ten times in her mother’s bedroom while she was at work. With the assistance of two stuffed animals, J.B. demonstrated that, during the assaults, she would lie on her back while John would get on top of her and insert his penis into her vaginal and anal areas. J.B. explained that she had never seen John’s “private” because she tried not to look. IsUsing a sketch of a female child, J.B. marked the vagina and anus as areas that John touched on her body. J.B. explained the she did not initially tell her mother about the abuse because John told her that she would get in trouble if she did.
After the videotape was played, J.B. testified that it was her on the tape, that she was telling the truth and that no one had told her what to say. J.B. identified Defendant in open court as the same person that she had referred to on the tape as “John.”
The State’s next witness was J.B.’s mother, T.W., who testified as to the child care arrangements she had with Defendant between May and December 2004 for her two children, J.B. and X.B. T.W. identified Defendant in open court and detailed the events of December 3, 2004, when she first discovered the alleged abuse of J.B. and the subsequent chain of events involving the child’s medical examinations and interviews at the Gingerbread House.
The State’s next witness was Dr. Huval of LSU hospital, a physician specializing in pediatric medicine, who testified as to the details of J.B.’s physical examination on December 3, 2004. Dr. Huval stated that J.B. presented with complaints of vaginal pain and claimed that her mother’s boyfriend had inserted his penis into her vagina and anus approximately ten times. The hospital categorized her complaint as a “scan” complaint which stands for “suspected child abuse and neglect.”
IfrDr. Huval described T.W. as devastated, tearful and heartbroken. During the physical exam, Dr. Huval noted “no hymen visualized.” The physical exam revealed the following:
The vaginal opening was very red and raw and she had quite a bit of discharge. The discharge was sort of yellow to brown in color, which is not a normal color for a vaginal discharge and it was a very foul odor ... So it was a purulent, foul smelling discharge, and then we would proceed with doing cultures to try to see if this child does, in fact, have a sexually transmitted disease.
Because she had pointed at her ... anal area, I was attempted [sic] to look at her anus but she wouldn’t allow me to. She began to cry, she sat up, she didn’t even want me to look, she was very fearful, and so at that point that’s when I said, okay, we don’t have to look at that.... In keeping with the do no harm and not traumatizing this patient further, I did not proceed with doing an anal exam on her at all.
Dr. Huval testified that, after examining J.B., she followed standard protocol and contacted Child Protection Services, the Shreveport Police Department and Dr. Ann Springer and made an appointment for J.B. at the Cara Center. During cross- *1182 examination, Dr. Huval conceded that, although she did not observe the presence of the hymen, she did not use a colposcope, which is the most accurate tool because of its magnification properties. She further testified that LSU hospital was not equipped with a colposcope, but that the Cara Center had the instrument.
The State’s next witness was T.G.’s daughter, A.G., who testified that she knew the difference between the truth and a lie and that no one had told her what to say. The State moved to introduce into evidence the videotaped interview of the child; and, overruling Defendant’s objections, the trial judge allowed the tape to be admitted and played for the jury.
17During the videotaped interview, A.G. indicated that John had touched her “behind” and her “privacy part.” A.G. stated that John put grease on her “privacy” and then put his “privacy” into her “privacy part.” Using a sketch of the female body and male body, A.G. indicated that her “privacy” was her vagina and his “privacy” was his penis. A.G. stated that the assaults occurred on the couch in the living room of T.W.’s home while she was at work. A.G. indicated that Defendant vaginally raped her on two separate occasions, that he tried to anally rape her once and that one of these incidents occurred just weeks prior.
After the tape was played, A.G. testified that it was her on the videotape and that she was telling the truth on the videotape. She then identified Defendant in open court as the same person she had referred to on the videotape as “John.”
The State’s next witness was T.G.’s daughter, C.G., who testified that she remembered giving the videotaped interview at the Gingerbread House. The State moved to introduce into evidence the videotaped interview of the child; and, overruling Defendant’s objections, the trial judge allowed the tape to be admitted and played for the jury.
During the interview, C.G. stated that John had put his hand in her “private part” while she was in T.W.’s bedroom. C.G. indicated that, on one occasion around Halloween, John asked her to follow him alone into T.W.’s room and, once inside, he reached into her shorts, pulled her underwear to the side and inserted his finger into her vagina. C.G. stated that she did not initially report the abuse to anyone because she was scared and she did not |sknow whether John had done this to anyone else. After the tape was played, C.G. testified that it was her on the tape and that she told the truth. She then identified Defendant in open court as the same person that she referred to on the tape as “John.”
Next, the State called T.G.’s daughter, J.W., who testified that she remembered giving the videotaped interview at the Gingerbread House. The State moved to introduce into evidence the videotaped interview of the child; and, overruling Defendant’s objections, the trial judge allowed the tape to be admitted and played for the jury.
During the interview, J.W. stated that John had touched her inappropriately at T.W.’s home. Using a sketch drawing of the female body, J.W. marked the mouth and vagina as the areas where John had touched her. J.W. explained that, after she took a bath, John used his fingers to separate her labia and looked inside in order to “make sure she was clean.” After the tape was played, J.W. testified that it was her on the tape and that she told the truth. She then identified Defendant in open court as the same person that she referred to on the tape as “John.”
The State’s next witness was T.G. T.G. testified that she left her children under the supervision of Defendant on numerous *1183 occasions because she believed he was a good caregiver. T.G. indicated that all three of her daughters claimed to have been sexually assaulted by Defendant and all three denied Defendant’s allegation that it was their brother who performed the sexual assaults.
|flThe State’s next witness was Dr. Jennifer Rodriguez, a medical doctor at LSUHSC, who was qualified as an expert in the field of sexual abuse involving children. While working at the Cara Center, Dr. Rodriguez examined J.B. and A.G. On December 13, 2004, after taking J.B.’s history, Dr. Rodriguez performed a colpo-scopic exam on the child, which revealed that the hymen had no tears or scarring and that her anus was normal. Dr. Rodriguez was asked to explain why, on December 3, 2004, Dr. Huval’s examination revealed that the hymen was not visualized, but yet on December 13, 2004, just ten days later, Dr. Rodriguez observed that the hymen had no tears or scarring.
In response, Dr. Rodriguez stated that, for a sexually abused child, the physical exam should be performed in the first 72 hours of abuse because “a child’s hymen and anal area has ... great capacity to heal, and even in studies it’s been shown that in a few days to weeks that even acute injuries can heal and have no significant anatomic changes that would indicate abuse.” Dr. Rodriguez testified that her findings regarding the hymen neither confirmed nor denied abuse, but rather indicated a normal exam.
On January 11, 2005, Dr. Rodriguez performed a colposcopic exam on A.G., which revealed that her hymen was normal and her anus was normal. “When asked whether a normal exam was common in child sexual abuse cases, Dr. Rodriguez responded:
It’s actually more common to have a normal exam than to have an abnormal exam. By my experience at the Cara Center and by literature that supports it, 85 to 90 percent of the time you have a normal exam in child abuse. You only have an abnormal exam 5 to 15 percent of the time.
| lf)Dr. Rodriguez also testified that, based on her experience, training and knowledge, the contraction of a sexually transmitted disease by children of the same ages as the victims in this case would be considered diagnostic for sexual abuse.[2]
The State’s next witness was Dr. Springer, who was qualified as an expert in pediatrics with a specialty in child abuse medicine. Dr. Springer testified that, when children come to the Cara Center as a result of alleged sexual abuse, the most common finding is nothing. Eighty-five percent of the time the physical exam and relevant laboratory findings are negative due to the fact that the injuries usually have time to heal before the patient presents for investigation. Regarding the presence of STDs in minor children, Dr. Springer testified as to the following:
The presence of sexually transmitted diseases means that they are sexually transmitted. And the American Academy of Pediatrics, the American Pediatric Infectious Disease Organization, and the child abuse authorities agree that certain sexually transmitted diseases are diagnostic of sexual abuse.
Dr. Springer explained that, in instances involving multiple sexual partners where one has an STD, some participants may contract the STD while others may not due to the stage of infection and timing.
The State’s next witness was Carol Hale, a deputy at the Caddo Correction *1184 Center (CCC) and a licensed practical nurse in the medical department. Part of Officer Hale’s duties involve conducting the medical assessments of inmates when they first arrive at the CCC. Officer Hale testified that, on December 9, 2005, she conducted a medical assessment of | nDefendant during which he disclosed that he had been treated for Chlamydia nine to ten years prior. Additionally, in November 2007, Defendant was treated with Doxycycline after testing positive for Chlamydia. Officer Hale identified Defendant as the same person that she assessed and treated in CCC.
Next, the State called Officer Brown, who testified that he had been contacted by Dr. Huval and advised that she had an eight-year-old female patient who had alleged that her mother’s boyfriend sexually assaulted her. Officer Brown further indicated that he had spoken with T.W., whose story was identical to that presented in court. Officer Brown stated that, on December 7, 2004, he was present for J.B.’s Gingerbread House interview, but was in a separate room where he supervised and communicated with the interviewer via a radio earpiece.
After the interview, Officer Brown contacted Defendant to schedule an interview, which took place on January 4, 2005. Officer Brown testified that, prior to beginning the interview, Defendant was informed of his Miranda rights and signed and dated the acknowledgment form. Officer Brown identified Defendant in open court as the same person he interviewed.
Officer Brown testified that, during the interview, Defendant indicated that he met T.W. approximately two years prior to the reported incident and that he moved in with her within a year of their meeting. Defendant further admitted to being a caretaker of her two minor children, but denied the allegations of abuse and declined to voluntarily submit a |1?DNA sample via a non-intrusive buccal swab. Defendant told Officer Brown that he believed T.W. was forcing her daughter to make the allegations in order to “put him out.” He also alleged that it was T.G.’s son who was responsible for the abuse of the four children.
Officer Brown stated that he was contacted three days after interviewing Defendant and advised to speak with T.G. T.G. told Officer Brown that her daughters claimed that Defendant had sexually assaulted them and an appointment was subsequently made for each one at the Gingerbread House. Officer Brown was present for the Gingerbread House interviews of T.G.’s daughters, but was in a separate room where he supervised and communicated with the interviewer via a radio earpiece.
Following his investigation of the allegations against Defendant, Officer Brown forwarded the information to the prosecutor’s office. Defendant was charged with the aggravated rape of J.B. and A.G. and molestation of a juvenile against C.G. and J.W. The assistant district attorney presented the evidence to a grand jury. After appearing at the grand jury, Defendant was arrested.
After presenting Officer Brown’s testimony, the State rested. Defendant then called as a witness, Shernita Ashley, who was an acquaintance of Defendant. Ms. Ashley testified that she met Defendant in January 2005, at a Shreveport nightclub and the two began a romantic relationship which continued for approximately five months. Ms. Ashley testified that, during their relationship, she and Defendant had unprotected sexual intercourse on two occasions, but that after doing so, she did not test [^positive for any STDs during her annual medical exam at the health unit on Creswell.
*1185 As previously stated, on June 20, 2008, a unanimous jury found Defendant guilty as charged on both counts of aggravated rape and both counts of molestation of a juvenile. On March 81, 2009, Defendant was sentenced to life imprisonment for each of the aggravated rape convictions, with the sentences to run concurrently, and to six years at hard labor for the molestation of a juvenile convictions, with the sentences to run concurrent to each other, but consecutive to the concurrent life sentences.
Defendant now appeals.

DISCUSSION

Assignment of Error Number One (verbatim): The trial court erred by allowing the videotapes from the Gingerbread House into evidence when the requirements of La. R.S. 15:440.4 and 15:440.5 were not met.
Defendant asserts that the recorded interviews of the victims from the Gingerbread House were improperly admitted into evidence because the State did not meet its burden of proving that the videotapes complied with the requirements set forth in La. R.S. 15:440.4 and 15:440.5. Defendant further argues that the State failed to lay a proper foundation for the tapes, that the content of the recordings was hearsay and that he was denied his constitutional right of confrontation. Defendant contends that the State failed to call the interviewers as witnesses to testify as to their respective qualifications. Defendant further alleges that the interviewers utilized leading questions designed to elicit certain responses from the children.
114The State counters that the recordings were properly admitted into evidence because there is no statutory requirement to call the interviewer to testify or to prove the interviewer’s qualifications. The State argues that the questions utilized by the Gingerbread House interviewers were intended to clarify the children’s responses, which were oftentimes nonverbal.
La. R.S. 15:440.1 provides:
It is declared to be in the best interest of the state that protected persons be spared from crimes of violence, and that persons who commit such crimes be prosecuted with a minimum of additional intrusion into the lives of such protected persons.
La. R.S. 15:440.2 provides in pertinent part:
A. (1) A court with original criminal jurisdiction or juvenile jurisdiction may, on its own motion or on motion of the district attorney, a parish welfare unit or agency, or the Department of Social Services, require that a statement of a protected person who may have been a witness to or victim of a crime be recorded on videotape.
[[Image here]]
(3) Such videotape shall be available for introduction as evidence in a juvenile proceeding or adult criminal proceeding.
B. For purposes of this Part, “videotape” means the visual recording on a magnetic tape, film, videotape, compact disc, digital versatile disc, digital video disc, or by other electronic means together with the associated oral record.
C. For purposes of this Part “protected person” means any person who is a victim of a crime or a witness in a criminal proceeding and who is ... (1) Under the age of seventeen years.
La. R.S. 15:440.8 provides:
The videotape authorized by this Sub-part is hereby admissible in evidence as an exception to the hearsay rule.
| ifiLa. R.S. 15:440.4 provides the following:
*1186 A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
(1) That such electronic recording was voluntarily made by the protected person.
(2) That no relative of the protected person was present in the room where the recording was made.
(3) That such recording was not made of answers to interrogatories calculated to lead the protected person to make any particular statement.
(4) That the recording is accurate, has not been altered, and reflects what the protected person said.
(5) That the taking of the protected person’s statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a licensed professional counselor, or an authorized representative of the Department of Social Services
La. R.S. 15:440.5 provides the following:
A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
(1) No attorney for either party was present when the statement was made;
(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;
(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
(5) Every voice on the recording is identified;
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party;
(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and
(8) The protected person is available to testify.
| i6The record establishes that the State complied with the requirements of La. R.S. 15:440.4 and 15:440.5. All videotaped interviews were both visual and audio electronic recordings. Each of the four victims on the videotaped interviews testified in open court that it was them on the tape, that no one had told them what to say and that the ■videotapes depicted what had actually transpired during their interviews. The testimony of Officer Brown and T.W. indicated that no relatives were present in the room with the children during the interviews. Additionally, a review of the videotapes establishes that no one other than the victims and the interviewers were present during each videotaped interview. While Officer Brown supervised all of the interviews, he did so from a separate room and communicated with the interviewers via a radio earpiece.
Defendant’s complaint that the interviewers were not called as witnesses to testify as to their credentials is without merit. The statute only requires that the interview be supervised by one of several specific enumerated persons, including a law enforcement officer. Since the videotaped interviews complied with the competency and admissibility requirements set forth in the statute, they are admissible into evidence as an exception to the hearsay rule.
Defendant further contends that the interviewers utilized leading questions to elicit specific responses from the vie- *1187 tims. While La. R.S. 15:440.4(A)(3) and La. R.S. 15:440.5(A)(4) prohibit leading questions designed to elicit a particular statement, the Louisiana Supreme Court has held that “[t]he rule forbidding leading questions is not so rigid that it 117should not yield somewhat to the discretion of the trial judge in the examination of a very young or timid witness.” State v. Carthan, 377 So.2d 308 (La.1979); State v. Roberts, 42,417 (La.App.2d Cir.9/19/07), 966 So.2d 111. It is not erroneous for a trial court to admit into evidence the videotaped interview of a child, in spite of leading questions by the interviewer, “when the questions were for clarification purposes and were appropriate under the circumstances.” State v. Roberts, supra; State v. Watson, 39,362 (La.App.2d Cir.4/20/05), 900 So.2d 325.
In the case sub judice, we find that the trial court did not err in overruling Defendant’s objections to the videotaped interviews on the grounds that leading questions were utilized by the interviewers. The victims were young children who were recounting horrific experiences, speaking softly when speaking at all and oftentimes only nodded their heads in response. Considering the children’s tender ages, the context of the interview and the fact that the questions were for clarification purposes only, the questions were appropriate under the circumstances. State v. Roberts, supra; State v. Watson, supra.
This assignment of error is without merit.
Assignment of Error Number Two (verbatim): A mistrial should have been granted when other crimes evidence was presented and the prosecutor impermis-sibly referred to Mr. Thomas’ right to remain silent.
Defendant asserts in his second assignment of error that he was deprived of a fair trial because of the State’s reference to “other crimes evidence” and because the prosecutor allegedly referenced Defendant’s failure to testify on his own behalf during closing arguments. According to | ^Defendant, when Officer Brown stated during his testimony that Defendant had been arrested “for another charge,” a mistrial should have been granted. Additionally, Defendant argues that he should have been granted a mistrial when the prosecutor stated in closing that “[i]t comes down to the statement of the children against the statement of a defendant.”
The State counters that Officer Brown’s comment regarding “another charge” was not the erroneous admission of other crimes evidence; however, if it was, the error was harmless. The State further contends that the response did not rise to a level that would warrant the granting of a mistrial. With regard to the prosecutor’s comments during closing arguments, the State alleges that the comments were not intended to focus the jury’s attention on the fact that Defendant chose not to testify and, therefore, did not warrant the granting of a mistrial. We agree.
La. C. Cr. P. art. 770 provides in pertinent part:
Upon motion of the defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney or a court official, during the trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible; [or]
(3) The failure of the defendant to testify in his own defense.
La. C.E. art. 404 B(l) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of *1188 a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal | |9case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Though generally inadmissible, evidence of other crimes, wrongs or acts may be introduced when it “relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” La. C.E. art. 404(B)(1); State v. Salter, 31,633 (La.App.2d Cir.2/24/99), 733 So.2d 58, writ denied, 99-0990 (La.9/24/99), 747 So.2d 1114. In State v. Salter, supra, this court stated:
The erroneous introduction of other crimes evidence is a trial error and subject to harmless error review. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94. Although La. C. Cr. P. art. 770, which pertains to mistrials, is couched in mandatory terms, it is a rule for trial procedure and subject to harmless error review. State v. Ingram, 29,172 (La.App.2d Cir.1/24/97), 688 So.2d 657, writ denied, 97-0566 (La.9/5/97), 700 So.2d 505. Reversal is mandated only when there is a reasonable possibility that the evidence might have contributed to the verdict. State v. Harris, 97-0300 (La.4/14/98), 711 So.2d 266; State v. Wille, 559 So.2d 1321 (La.1990).
The objected-to testimony occurred when the State asked Officer Brown whether he arrested Defendant at the conclusion of the interview, to which Corporal Brown responded “for another charge.” It is highly unlikely that this comment contributed to the verdict or deprived Defendant of a fair trial. Additionally, should this statement qualify as the erroneous admission of other crimes evidence, we find the error to be harmless.
With regard to the prosecutor’s comments during closing statements, we agree with the trial court that the comments were not in reference to lanDefendant’s failure to testify. The prosecutor stated the following in his closing argument:
This case really comes down to credibility, and we all know when it comes to these types of cases, it’s not going to be a situation where it’s done in the presence of other people. It comes down to the statement of children against the statement of a defendant. And the ultimate question is, do these children have a right to be believed. Do they have a right to be believed given the testimony that you’ve heard this week.
In State v. Shed, 36,321 (La.App.2d Cir.9/18/02), 828 So.2d 124, writ denied, 02-3123 (La.12/19/03), 861 So.2d 561, this court explained:
The purpose behind [La. C. Cr. P.] art. 770(3)’s prohibition against prosecutorial comment is to protect the defendant’s Fifth Amendment right against self-incrimination by preventing attention being drawn directly or indirectly to the fact that the defendant has not testified on his own behalf. State v. Mitchell, 00-1399 (La.2/21/01), 779 So.2d 698; State v. Fullilove, 389 So.2d 1282, 1283 (La.1980). To warrant the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury’s attention on the defendant’s not testifying. State v. Mitchell, supra; State v. Reed, 284 So.2d 574, 576 (La.1973); State v. Howard, 262 La. 270, 263 So.2d 32 (1972).
*1189 It is clear from the prosecutor’s comments that he was referring to Defendant’s statement to the police wherein he denied the allegations against him made by the four children. Furthermore, the comments did not draw attention to Defendant’s choice not to testify at trial.
This assignment of error is without merit.
Assignment of Error Number Three (verbatim): The trial court erred in allowing expert opinion testimony without reports being submitted to the defense.
In his last assignment of error, Defendant asserts that the trial court erred in overruling his objections to the expert witness testimony of Drs. Springer, Rodriguez and Huval when none of the experts had | ¾, previously provided Defendant with a report detailing their opinions prior to testifying.
In response, the State points out that Dr. Springer simply did not provide a report. Dr. Rodriguez did produce reports of the two examinations she conducted on J.B. and A.G., as did Dr. Huval for her examination of J.B., all of which were made available to Defendant. The State concedes that the experts did not provide a report detailing their opinions, but argues that their testimony indicated neutral findings which neither proved nor negated Defendant’s guilt. Further, Drs. Rodriguez and Springer were made available to Defendant’s counsel during a pre-testimony conference.
La. C. Cr. P. art. 719(A) provides:
Upon motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph, or otherwise reproduce any results or reports, or copies thereof, of a physical or mental examination, and of scientific tests or experiments, made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under this Article even though it is not intended for use at trial.
La. C. Cr. P. art 729.5(A) provides:
If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
122As the trial court pointed out, Defendant was aware that Dr. Springer would be called as a witness and failed to raise the issue of the absence of her report prior to trial. Ultimately, the trial judge granted Defendant an opportunity to question Drs. Rodriguez and Springer outside of the presence of the jury in order to ascertain their opinions. Following the conference with the expert witnesses, counsel for defense stated the following:
[W]e found out from the two of them that they are prepared to give opinions about the regenerative capacities of the tissue of the vagina. And to the extent that the negative findings — or correction, the normal — the data of hymen no tear, no scar and anus normal could not be taken to rule out injury having— signs of injury having been present ten days earlier because remarkable regeneration has been noted. That opinion will be expressed, and that’s documented in the literature and in the personal experience of both.
Another opinion would be expressed that Chlamydia is a sexually transmitted *1190 disease, ... and that if you have Chlamydia it means you have a sexually transmitted disease. And if you have a sexually transmitted disease, it means that it was sexually transmitted. Whether it can be transmitted by means other than sexual contact, I don’t have clear sense of what the answers to that would be, but these are opinions they are going to express.
Although Defendant was not provided with written reports detailing the anticipated testimony of Drs. Huval, Rodriguez and Springer as is contemplated by La. C. Cr. P. art. 719, we find the error to be harmless. The record shows that Defendant, through a hearing which interrupted the jury trial, was made aware of the opinions that the expert witnesses would offer in their testimony. Further, the State was never in possession of any such reports because they were never provided by the medical experts. In addition, Defendant was provided with copies of the reports from the physical examinations which formed the basis of the opinions of Drs. Huval | ¡^and Rodriguez. Finally, the testimony given by Drs. Rodriguez and Springer indicated neutral findings, which neither proved nor negated Defendant’s guilt.
Accordingly, we find the admission into evidence of the testimony of Drs. Huval, Spring and Rodriguez, without the prior submission of a written report detailing their opinions, to be harmless error.

CONCLUSION

For the foregoing reasons, the convictions and sentences of Defendant, John R. Thomas, are affirmed.
AFFIRMED.

. To maintain the anonymity of the four child victims in this case, we will use the initials of the mothers of the victims throughout this opinion.

. Dr. Rodriguez's statement was made in accordance with the findings of the American Academy for Pediatrics and the Centers for Disease Control.