FREDERICKA HOMBERG WICKER, Judge.
| ¡¿Defendant, Hai A. Duong, appeals his convictions for aggravated rape against N.T., attempted aggravated rape against J.T., molestation of a juvenile against both N.T. and J.T., and aggravated oral sexual battery against J.T. Defendant raises three assignments of error, two of which we find lack merit. Defendant, however, in his second assignment of error claims that the trial judge erred in denying his *626 motion for a new trial on the ground that the prosecuting attorney improperly questioned a state -witness regarding defendant’s post-arrest silence during trial in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). For the reasons which follow, we find that the prosecutor’s reference to defendant’s post-arrest silence was clearly improper and that the trial court clearly erred in ruling that the prosecutor could query the investigating officer regarding defendant’s post-arrest silence. Furthermore, we find that the prosecutor compounded this clear violation by referring to defendant’s silence in his rebuttal closing argument. However, in the context of this particular trial, these errors do not warrant reversal. Accordingly, we affirm defendant’s convictions and sentences. We remand this matter with instructions for the trial court to notify [¡¡defendant of his sex-offender notification requirements and correct defendant’s uniform commitment order.

PROCEDURAL HISTORY

On June 21, 2012, a grand jury indicted defendant on five counts: counts one and two charged defendant with committing aggravated rape in violation of La. R.S. 14:42; counts three and four charged defendant with committing molestation of a juvenile in violation of La. R.S. 14:81.2; and count five charged defendant with committing aggravated oral sexual battery in violation of La. R.S. 14.-43.4.[1]
At his arraignment on July 18, 2012, defendant pled not guilty. On August 16, 2012, the trial court granted defendant’s motion for a copy of the video recordings of the victim interviews at the Children’s Advocacy Center (“CAC”). This grant was subject to a protective order. On June 10, 2013, a jury was selected. Trial continued through June 11 and 12, 2013, concluding on June 12, 2013, when the jury returned a verdict finding defendant guilty as charged on counts one, three, four and five. On count two, the jury found defendant guilty of a lesser charge, attempted aggravated rape. On the first day of trial, the trial court granted the state’s motion for a second interpreter during instances in which a witness, in addition to defendant, did not speak English fluently. On the second day of trial, the trial court overruled defendant’s objection to the admission of the victims’ CAC video interviews.
On June 17, 2013, defendant filed a motion for new trial, supplementing the motion on June 18, 2013. On June 24, 2013, the motion for new trial was heard, then denied. After defendant waived sentencing delays, the trial court sentenced defendant to imprisonment terms of: life in prison on count one; 50 years on count |4two; 15 years each counts three and four; and 10 years on count five. These sentences were to be served at hard labor and concurrently, without the benefit of parole, probation, or suspension of sentence. On the same date as sentencing, defendant made an oral motion for appeal and filed a pro se written motion for appeal, which was granted on June 25, 2013.

FACTS

Preliminarily, for the ease of reading, we have given the victims and their parents fictitious names in the remainder of this opinion.[2] The victims, J.T. and N.T., will be called Janet and Nicole. The victims’ parents, C.T. and A.T., will be called Carl and Alice.
*627 This is defendant’s appeal from his original trial on five counts charging him with the molestation, oral sexual battery, and rape of two victims, Janet and Nicole. Defendant’s crimes against Janet and Nicole occurred in the 1990s when they were children under the age of twelve. However, this case was not brought to trial until 2013 due to defendant’s flight from Louisiana after Janet and Nicole made their allegations against defendant. At trial, the jury heard Janet and Nicole, now both adults, testify. The jury also viewed the CAC interviews of Janet and Nicole which were recorded on May 17, 1999. At trial, the jury also heard testimony from: Terry Ford, a human resources manager at defendant’s former employer; Detective Richard Broussard, a detective who investigated the case and supervised the 1999 victim interviews; Carl and Alice, the victims’ parents; as well as Mary Duong, a relative of Alice and the wife of defendant. In addition, defendant testified in his own defense.
Carl testified that he married Alice and had three children: Nicole; Janet; and a son. Mary married defendant in 1984. Carl testified that during the time period |sfrom 1991 through 1995, he lived with his wife and children in Avondale. From this address, Carl ran his after-work mechanic shop. Carl testified that during this time period, he did not hear any complaints from his children that defendant had touched them inappropriately. In 1995, Carl and Alice divorced.
After the divorce, the girls’ mother, Alice, moved out of the house. The children primarily lived with Alice and visited their father, Carl, on the weekends. Also after the divorce, Carl worked with defendant repairing cars on weekends, and after their primary jobs ended for the day, on weekdays. Nicole and Janet spent time with Carl and defendant when they visited Carl. In 1999, Carl had a new girlfriend and therefore did not spend much time with his daughters. Carl testified that around this time, his daughters spent time and had overnight stays with Mary and defendant. Carl clarified that defendant had the opportunity to be alone with his daughters. Nicole and Janet did not report abuse to their father prior to 1999. Carl testified that after Nicole and Janet alleged that defendant abused them, defendant left without telling Carl where he was going.
Terry Ford, a human resources manager for the successor company of the In-puVOutput Company where defendant worked in 1999, authenticated defendant’s employment records with Input/Output. These records showed that defendant began working for Input/Output on January 28, 1982, and ended his employment by resignation on May 14, 1999. Mr. Ford clarified that these documents do not show when defendant gave notice of his intention to resign. On May 19, 1999, defendant filled out a “payout request form”, requesting a cash distribution from his company’s “401K” plan. Both defendant and his wife signed this form. Defendant incurred a tax penalty for taking this cash distribution.
Mary Duong, defendant’s wife, testified that she worked at Alice’s wig store in the 1990’s. Mary explained that during this time, she lived with defendant at a | (¡house across the street from the Catholic church which Janet and Nicole attended. The two children went to this church multiple times each week to attend mass and catechism classes. Janet and Nicole went to defendant’s house when they attended this church. On Mondays through Saturdays, the days she worked at her wig shop, Alice regularly dropped off her children at Mary and defendant’s house.
*628 Mary testified that during the time before Alice’s divorce, the majority of the time that the victims spent at her house, defendant was outside working with Carl on cars. Mary further testified that the victims rarely spent the night at her house during this time period. According to Mary, at some point in the 1990s, Alice, Carl, and their children lived in the house owned by Alice’s mother. Alice’s family eventually moved out of Alice’s mother’s house and into another house. At this new residence, Alice began suffering marital trouble when her husband had an affair and used a credit card for gambling. Alice and her husband eventually divorced.
Mary testified that after Alice divorced her husband, Nicole began to talk back to Mary during Nicole’s Saturday visits to Mary’s house. According to Mary, Nicole would leave the house, without permission, and sleep over at a cousin’s house.
Mary testified that one day in 1999, at Alice’s shop, Alice’s daughters, Janet and Nicole, made serious allegations against defendant. After learning of these allegations, Mary called defendant to come pick her up from the store and go home. Mary questioned her husband, defendant, about the allegations which the victims had made. According to Mary, defendant did not respond to these questions. Mary admitted to having a follow-up conversation with Alice that night, but could not recall what was said during that conversation. On May 17, |71999, police officers came to Mary’s house; Mary did not give a detailed description of the conversation she had with these officers.
Mary testified that after Janet and Nicole made these allegations, defendant left their family home, unaccompanied by her and without telling her where he went. Mary testified that defendant left because the victims’ father threatened to kill him. Mary testified that not long after the victims made their allegations against defendant, defendant ended his employment, and she and defendant signed a form to cash out his 401K.
A few months after defendant fled, Mary came back into occasional contact with defendant by telephone. Mary admitted that after a period of time, she flew to meet and live with defendant in another state. Mary stayed in this other state for about a month before returning to the New Orleans area. According to Mary, defendant came back to the New Orleans area to pick Mary up. They then again left the state, this time by car. According to Mary, she and defendant traveled by car to New Mexico, where they continued to live together. The couple then traveled to Cheyenne, Wyoming, where they lived for a short while before returning to New Mexico. In 2010, while in New Mexico, defendant suffered a heart attack. After this, Mary testified that she and defendant traveled back to Cheyenne, Wyoming, together.
Mary testified that while she and her husband were on the run, her husband would use an alias, “Henry Tony.” Mary testified her husband used this alias because he was hiding from the government because the government wanted her husband in connection with the victims’ accusations.
At some point after Mary initially left the New Orleans area, she returned to attend her father’s funeral. Mary admitted when she saw the victims at that funeral she cried and told them she was sorry for them. Mary however expressed no | ¡¡opinion as to whether she believed the victims had suffered any abuse by defendant.
After their final move to Cheyenne in 2012, defendant was pulled over for an alleged traffic violation. When the officer *629 effecting this traffic stop found that defendant had an outstanding warrant in Jefferson Parish, defendant was taken into custody and eventually extradited back to Jefferson Parish. Mary stayed in Cheyenne for several months before selling her belongings and returning home to the New Orleans area.
Mary testified that she never witnessed defendant commit any of the acts of which he was accused. Mary testified that defendant and defendant’s mother were present at their house during the times when Janet and Nicole were there, and Mary was absent. Mary admitted that she could not be sure that defendant’s mother would always see what was going on in the house. Mary testified that she feels sad for Janet and Nicole because of what happened to them. When asked by the prosecution “who caused all this pain to all the women in this family,” Mary indicated that it was her husband.
Alice testified, identifying herself as the victims’ mother. During the time period in the 1990s when she was still married to Carl, Alice would bring the children over to defendant’s house for social visits, and babysitting when she needed to go to work. This occurred both on the weekends and weekdays. Janet and Nicole were ten and twelve years old, respectively, when Alice separated from Carl. Alice also testified that Janet and Nicole were around the ages of eleven and twelve by the time she actually became divorced.
After the divorce, Alice usually dropped off the children with their father, Carl, at his house on Saturdays. Alice testified that when she did this, defendant was usually there working on cars. Alice testified that she usually stayed for a |9short period of time, but would leave and then pick the children up on Sunday after church. Alice testified that Nicole would occasionally tell her that she did not want to go to her father’s house. Alice testified that her children’s former catechism classes took place at the church on Saturday and Sunday after mass. Alice also testified that she often dropped her children off at defendant’s house because she was close with Mary and defendant.
According to Alice, Nicole first told her that defendant had abused her and Janet during an argument at Alice’s wig shop. According to Alice, this argument happened because Nicole had become a rebellious child and had been skipping school. According to Alice, during this argument, “[Nicole] just told me that — [s]he just come out and said, “Well, my problem is, you know, [defendant], Hai ... he molested me since I was little.’ And I went— ‘And raped.’” Nicole told Alice that her abuse happened only at Carl’s house. Alice testified, “[Nicole] told me that it happened since they were, like, four or five. I just — I said only a monster could do something to children, you know.”
After this conversation, Alice confronted Mary who was also at the wig shop. According to Alice, Mary responded that she did not know whether the allegations were true, and then called defendant to be picked up. Alice then questioned Janet about Nicole’s allegation. Janet responded, “It happened to me, Mom.” According to Alice, during a follow-up call, Mary told her that her husband had told her “about everything, what happened to the children.”
After her daughters made these allegations, Alice sought advice from her parents; they claimed that it was best to keep the matter in the family. Alice did not follow that advice, but rather encouraged her children to report the abuse to a school counselor. The victims did this, and a detective eventually came to their house to ask questions. As a result of this questioning, on Saturday, May 17, 1999, *630 | inthe detective took the victims for an interview at the CAC and a medical examination at Children’s Hospital. Alice also confirmed that on this date she gave a recorded statement to Det. Broussard.
Alice testified that other than the day at her shop, when her daughters alleged their abuse, she never really pushed them to talk about it. She described the abuse as hard on the family and awkward to talk about. According to Alice, her daughters subsequently received eight months of counseling to help them cope with this abuse.
Det. Broussard of the Jefferson Parish Sheriffs Office testified that he participated in the investigation of the alleged aggravated rapes of Nicole and Janet, which ultimately led to defendant’s arrest. Det. Broussard first became involved in this investigation because of referral by the child protection agency on May 10, 1999. This referral informed Det. Broussard that two children had complained of sexual abuse, with the most recent incident having occurred two months before the referral. Pursuant to normal procedure, the children were interviewed at the CAC.
On May 17, 1999, Det. Broussard met privately with Alice at the CAC before Nicole and Janet were interviewed there. He explained the interview procedure to Alice and heard Alice’s description of the allegations. CAC interviewer Omalee Gordon also met privately at the CAC with Alice in order to explain the interview procedure. The children were not in the room for this discussion.
After Det. Broussard explained the procedure to Alice, Nicole was interviewed at the CAC by Omalee Gordon. During the interview, Nicole and Ms. Gordon were the only individuals in the interview room. Det. Broussard monitored that interview in a separate room as it was happening. Det. Broussard |nwatched the interview occur on a television screen and was able to talk to Ms. Gordon through a microphone in his room and an earpiece that Ms. Gordon was wearing. An audio and video VHS recording of this interview was made. Janet was also individually interviewed by Ms. Gordon, using the same procedures. During that interview, Det. Broussard monitored the interview in the separate room in the same manner as he had done during Nicole’s interview. After these interviews were complete, Det. Broussard received two VHS tape recordings of the interviews. One of those VHS tapes became State’s Exhibit 14. This VHS tape, containing Nicole and Janet’s recorded interviews, was played for the jury. When played, this video showed that it was recorded on May 17, 1999. Before Ms. Gordon asked any questions, Ms. Gordon can be heard declaring that Det. Broussard was “monitoring the equipment.” Ms. Gordon then proceeded with her interviews of Nicole and Janet. In each of their interviews, Nicole and Janet detailed substantially the same allegations against defendant which they later testified to at trial.
In her CAC videotaped interview, Nicole stated that she was thirteen years old at the time of the interview and that her date of birth was December 13, 1985. Nicole also stated that defendant began molesting her when she was six years old. Nicole stated that defendant raped her, which she explained as having intercourse with her. Defendant also touched her all over her body including her chest. This occurred at Mary’s house when Mary was supervising her while her mother worked. Nicole stated that while she and Janet were sleeping in Mary’s room, defendant would wake up Nicole, climb on top of her, and touch her all over her | iabody. Defendant *631 would also do the same to Janet.[3] When Mary would walk into the room, defendant would get off of Nicole and go into the bathroom to get ready to go outside and work.
Nicole further stated that when she was six years old, defendant touched her chest and vagina with his hands under her clothes. When defendant was on top of Nicole and touching her, he told her not to tell. Defendant would unbutton Nicole’s clothes. The incidents occurred in the morning, when defendant was at the house. The incidents occurred in defendant’s room and also in the computer room. When Nicole would do research in the computer room, defendant would touch her chest. She would lock the door when she entered the computer room but defendant would somehow open it. The incidents occurred during the holidays and the summer because Nicole did not visit defendant’s house on school days.
One week before Nicole turned eleven years old, defendant raped her. Nicole stated defendant raped her more than three times throughout the period of abuse. Nicole detailed the instances where defendant repeatedly raped and sexually molested her in her testimony at trial. Her trial testimony on these repeated rapes and instances of abuse was substantially similar to her statements in her 1999 CAC interview.
At the end of her CAC interview, Nicole told Ms. Gordon that she first disclosed these incidents to her mother one month before the interview, telling her mother exactly what she had just stated in the current interview. A week after Nicole disclosed to her mom, she also disclosed to the school counselor, Ms. Gorman.
113In her CAC videotaped interview, Janet also provided a statement detailing her rape and molestation by defendant that was substantially similar to her trial testimony. As a young child, in her CAC interview, Nicole explained that defendant put his “ding-a-ling” in her “private.” Janet indicated the location of her private by pointing to her crotch. Using a paper diagram, Janet also marked where defendant touched her on her body and what parts of his body defendant touched her with.[4] The only substantial difference between Janet’s statement in her CAC interview and her testimony at trial is that at her CAC interview, Janet indicted that there may have been more than one instance when defendant raped her by vaginal sexual intercourse.
After the recording of the CAC interviews finished playing, the trial court allowed the continued questioning of Det. Broussard by the prosecution. Det. Broussard also claimed that during these CAC interviews, he was confused by the dates the victims were giving in their answers. Det. Broussard testified that he spoke to Ms. Gordon twice during the interviews, using his microphone and her earpiece, asking her to clarify those dates. Det. Broussard testified that these questions were observable on the video recording of these interviews when it shows the two times that Ms. Gordon paused.
Det. Broussard testified that after these CAC interviews were taken, the CAC arranged for the two girls to be examined by Dr. Scott Benton at Children’s Hospital. *632 Det. Broussard further testified that during these interviews, he never questioned Nicole or Janet regarding any inconsistencies in answers they gave during these interviews.
114Pet. Broussard took a recorded statement from Alice. After taking this statement, Det. Broussard continued his investigation in the Avondale area with the intent of interrogating defendant. When he arrived at defendant’s home in Avon-dale, defendant’s wife, Mary, answered the door. Det. Broussard testified that when he asked her about his investigation, she became hostile. Mary claimed she did not know where her husband was located, and she accused Alice, Nicole, and Janet of lying. Det. Broussard learned the location of defendant’s employer, Input/Output, from Mary and then proceeded to that location. At Input/Output, Det. Broussard spoke to various staff members and discovered that defendant had quit his job there that day. After Det. Broussard was unable to locate defendant, he sought an arrest warrant for him.[5] On May 25,1999, an arrest warrant was issued and Det. Broussard subsequently registered that warrant with the National Crime Information Center, a nationwide arrest warrant database. With Det. Broussard unable to locate defendant, the case went unresolved from 1999 until 2012.
In February 2012, an officer stopped defendant in Cheyenne, Wyoming, for a suspected traffic violation. That officer subsequently found defendant’s outstanding warrant from Jefferson Parish and began the procedure to have him extradited back to Louisiana. On March 12, 2012, Det. Broussard met defendant at the Jefferson Parish Correctional Center. Defendant did not give a statement.
Janet and Nicole testified in person at the trial. Their testimony at trial, years after their abuse ended, was substantially similar to their videotaped interviews taken at the time they first informed their mother of the abuse. Janet testified she was 26 years old and her birthday was November 20, 1986. Janet 11r,confirmed that Adice was her mother, that Carl was her father, and that she was related to Mary, defendant’s wife. In the late 1990s when she and her family were living in Avondale, her parents divorced and her mother moved out of the family home. Janet testified that at this time, she and her sister regularly attended a Catholic church across the street from the house where Mary and defendant lived. Janet confirmed that when she was a child, her mother worked full-time at her wig shop and her father worked repairing cars. Janet testified that she and her sister would go over to defendant’s house so that defendant and Mary could babysit them and they could attend catechism at the church on Saturday and Sunday. Janet confirmed that defendant’s mother also lived at this house. Janet testified that her brother did not regularly go over to defendant’s house with her and her sister. When Janet’s parents divorced, her mother moved to Metairie. Janet’s father remained in Avondale and continued his friendship with defendant.
Janet testified that defendant sexually abused her when she was younger at both his home and her father’s home. The first incident of sexual abuse occurred at defendant’s house in his bedroom, on his bed. Janet described defendant’s bedroom as *633 being across from the bathroom, with a bed inside it on the left side of the room. Janet testified that defendant first abused her in this bed by touching her both above and under her clothing. According to Janet, defendant touched her breasts, crotch, and genitals. During this incident, defendant told Janet, “[d]on’t say anything; you’ll get in trouble for it.”
Janet testified that after this first time, defendant repeatedly sexually abused her throughout her childhood. Janet testified that the molestation by defendant mainly occurred on Thursdays and Saturdays, the days Janet and Nicole attended the church across from defendant’s house. Janet explained that defendant would abuse her when no one else was at the home. Defendant would remove his clothes 11fiand make Janet touch him. Janet specifically testified that during these instances of abuse, defendant would insert his fingers inside of her vagina. After defendant committed these acts, he would offer Janet money in the amount of five, ten, or twenty dollars, and instruct Janet not to say anything about the incident.
Janet described her molestation as having occurred over the period between when she was five or six years old and continuing until she was ten or eleven years old. Janet testified that when Mary was home, defendant would neither molest her nor show her pornography. Janet contrasted this from when she was home alone with defendant; she testified that, at those times, “I knew it was coming right away.” This made her afraid to go over to defendant’s house, but she did not tell anyone of her fear because she thought she would get in trouble. Janet testified that Nicole was at the house during the instances of her sexual abuse, but that she did not remember whether Nicole was in the room during the incidents. Janet and Nicole typically traveled together. Defendant’s mother was in the house during these instances of sexual abuse, but she was never in the room.
Describing other instances of sexual abuse, Janet testified that defendant would occasionally place a large back massager on her “privates.” Defendant was naked and touching himself while he did this. Janet testified that reflecting back on this incident, she believed that defendant, when he was placing this back massager on her privates, was “enjoying the show.” Janet accused defendant of showing her pornographic videos. As an adult testifying at trial, Janet described these videos as showing “[njaked men and girls.”
Janet testified that this sexual abuse escalated at the time that she was ten or eleven years old, when defendant inserted his penis inside of her. Janet testified that this first occurred at her father’s house when she was alone with defendant. The first incident of intercourse occurred in the living room on the couch. Janet |17also described this as the first time defendant put his mouth on her vagina. Janet explained that this first instance of sex with defendant hurt and felt like it lasted a long time. Janet testified that after this instance of sex occurred, defendant gave her money for “junk food” and left the house. She went to church without telling anyone of what had just occurred.[6]
Janet testified that after this first incident of sexual intercourse with defendant, she did not remember whether defendant molested her or had sex -with her again. Janet testified that a few weeks after this instance of sexual intercourse, her sister, Nicole, “came out to my mom.” Janet testified that this instance of molestation *634 occurred at her father’s house, probably on a Saturday.
Janet confirmed that after Nicole told their mother that defendant had been “molesting and raping” them, their mother came to her and asked her whether Nicole’s allegations were true. Janet testified that she told her mother that Nicole’s allegations were true. Janet testified that she did not talk with Nicole about the abuse since it happened because “it’s embarrassing.” Janet testified that after her first conversation with her mother about her sexual abuse, she never talked about that abuse with her mother again.
Janet testified that she remembered giving an interview about defendant at the CAC, and that her answers at that interview were truthful. However, she could not recall many of the details from her CAC interview. Janet confirmed that after she and Nicole made their allegations against defendant, he and Mary fled. Janet did not know of their location after they fled. Janet was angry after defendant fled and went to two or three counseling sessions. Janet testified that it was a relief to disclose what defendant had done to her.
11SJanet described herself as feeling “disgusted” and just not wanting to remember her abuse. Janet testified that the abuse still affects her today and confirmed that she collects sex-offender registration cards which are sent to her house. She testified that she collects these cards because “you know what those people are capable of.”
Nicole also testified at trial. At the time of trial Nicole was 27 years old. Nicole testified that after her parents divorced, she spent the majority of her time with her mother, visiting her father primarily on weekends. Nicole described her father’s relationship with defendant during this post-divorce period as “friendly.” Nicole admitted that after her parents divorced, there were times when she would leave her father’s house to spend the night at her cousin’s house. Nicole explained that this cousin’s house was a block away from her father’s house, and that she always had her father’s permission to leave to spend the night there. Nicole denied ever leaving at night with a boyfriend without permission.
Nicole confirmed that defendant and Mary lived in a house across the street from a church which she and Janet attended and that her parents would entrust defendant and Mary with the responsibility of babysitting her and her sister. Nicole confirmed that defendant regularly came over to her father’s house in order to help him work on cars. Nicole testified that in addition to going to defendant’s house to be babysat, she and Janet would go to defendant’s house on Thursdays and Saturdays to attend catechism classes at the church. Nicole confirmed that defendant had a job and that on the Thursdays she went over to defendant’s house, she would only see defendant in the evenings.
Nicole testified defendant first sexually abused her by placing a back massager on her vagina when she was seven years old. In addition to using the back massager, defendant took off his clothes and touched Nicole’s “bottom” and |19vagina. Nicole testified that over the span of several years, defendant committed additional acts of sexual abuse that progressed in severity. Describing one incident, Nicole testified she was sitting on a couch in the salon room on the day of a school fair when defendant came into the room with a bag of grapes and sat next to her. Defendant then proceeded to push Nicole’s underwear to the side and insert the grapes into Nicole’s vagina. Defendant then left without saying anything. This incident occurred while Nicole’s father was in the garage. Nicole testified that she has never before told anyone of this grape inci *635 dent. Nicole also testified that defendant showed her a pornographic movie which depicted men and women having sex. Nicole claimed defendant would expose his penis to her and that defendant had put his mouth on her vagina.
Nicole testified that the first instance of sexual intercourse with defendant occurred at his home in his bedroom. Nicole’s sister and defendant’s mother were at the home at the time it occurred, but they were not in the bedroom. Nicole could not remember the exact date that the defendant first raped her, but she estimated that she was about seven years old at the time it happened. Nicole could not recall whether defendant had used a condom, but did believe that defendant had ejaculated.
Nicole also testified regarding an instance of rape by vaginal sexual intercourse that occurred around the time of the Vietnamese New Year. Nicole testified:
He pulled down his — When he pulled down my panties, he was pulling down his pants. He started — he tried to push his penis inside of me. I told him to stop because it hurt. And he said the pain would go away. And it never did.
Nicole went on to specifically testify that during this incident defendant eventually inserted his penis into her vagina.
|9nNicoIe testified that another instance of defendant raping her had occurred at her father’s house in the salon room.[7] Testifying regarding that instance of sexual intercourse, Nicole stated, “All I remember is him pulling my panties down and his pants while we were sitting on the couch.” Nicole testified that during this incident, her sister was with her mother and not at the house. Nicole testified that her father was in the garage at the time this happened. Nicole described the garage as not connected to the house, but rather is a separate structure built just a few feet away from the house. Nicole testified that the instance of rape at her father’s house occurred on a Saturday afternoon.
Nicole testified that defendant raped her again after this, but she could not recall many details of these incidents. According to Nicole, after defendant raped her, he told her not to tell anyone and gave her money in the amounts of five, ten, twenty, or more dollars. Nicole claimed that she put this money back in his closet because she knew what happened was wrong. Nicole testified that she did not tell anyone about this abuse initially because she was embarrassed.
Nicole testified that defendant continued molesting and raping her over a period of time, with the last incident of intercourse occurring a few weeks before Nicole disclosed the abuse to her mother. This last incident occurred at defendant’s house. At the time it occurred, defendant’s mother was on the property, in the garden. Nicole testified that her sister, Janet, may have been with their mother at a location other than defendant’s house.
Nicole admitted that she disclosed defendant’s abuse of her to her mother during an argument the two of them were having. Nicole confirmed that she had not talked to her sister, Janet, about this abuse since the initial disclosure to their 121 mother. Nicole remembered giving her recorded CAC interview, but she did not remember many of the things she had said during that interview. Nicole testified that she had undergone a “very short” period of counseling following her reporting of these incidents.
*636 Dr. Scott Benton, an expert in Pediatric Forensic Medicine and Child Abuse, including Child Sexual Abuse, was employed at Children’s Hospital in 1999. Dr. Benton testified on behalf of the State that he treated Janet and Nicole at the Audrey Hepburn CARE Center at Children’s Hospital on May 17,1999. Dr. Benton created medical reports in connection with his evaluations of Janet and Nicole.[8] These medical reports contained the results of Dr. Benton’s examination of Janet and Nicole, as well as the statements by Janet and Nicole which Dr. Benton recorded.[9] The victims’ statements to Dr. Benton did not differ from their statements in their CAC interview or from their trial testimony. These statements further corroborate the victims’ explanation of their abuse.
Dr. Benton conducted a physical examination of Janet and the results were normal. He also stated that Janet’s hymen was intact. Dr. Benton explained that it is possible for a child to have been sexually abused by penile intercourse and still have normal results. According to Dr. Benton, there are many sexual acts that can be performed that do not cause trauma. Dr. Benton further explained that when the activities progress over time, the perpetrator can progressively dilate the vagina until he is able to actually penetrate the vagina. According to Dr. Benton, one reason there is no injury is because of the gentleness of the perpetrator. He explained that these are not forced acts but are seduction acts, and also the [ 22perpetrator could use a lubricant, including saliva. Another reason for a lack of trauma is that the body is designed to repair itself from injury, especially in areas such as the vagina, anus and mouth, which are able to rapidly heal. Dr. Benton explained that events that are beyond the ability to heal, which cause scars, are not common.
Dr. Benton also stated that there was delayed disclosure in this case. He explained that the reasons for delayed disclosure include that the child is naive to what happened to her, external factors such as being threatened or bribed, and internal factors such as the belief that if she tells, bad things are going to happen, embarrassment over discussing something intimate, mental health issues, and self-blame, especially if the child takes bribes. Dr. Benton explained that Janet exhibited some of these reasons, including embarrassment. Dr. Benton believed that Janet may have been conflicted regarding her abuse because defendant gave her money and she spent it on junk food.
Dr. Benton also explained that children are selective about what they disclose to certain people, and they may disclose different details to different classes of people. According to Dr. Benton, people will tell doctors things they will not tell other people.
Regarding Nicole and her statements to him, Dr. Benton explained the reasons for delayed disclosure that she exhibited were that her family did not talk about problems, and that defendant offered bribes, although she refused them. Dr. Benton further explained that demeanor of the child is not indicative as to whether there was abuse because people react differently. According to Dr. Benton, there appears to be elements of sequential disclo *637 sure, in that Nicole subsequently disclosed an incident that she had not previously disclosed to anyone else. Dr. | ^Benton explained that it is important to focus on what was omitted on the various occasions, whether it had significance, and the reason for not mentioning it.
After Nicole provided a history, Dr. Benton performed a medical examination. During the examination, Dr. Benton found a lack of continuity in Nicole’s hymen, which indicated that Nicole’s hymen had been previously injured and healed in that position. Dr. Benton believed his findings were consistent with rape and was definitive of blunt penetrating trauma.
After the state rested, defendant testified on his own behalf. He testified that before this case, he had never been arrested for a crime. According to defendant, his wife asked him whether he did something with the victims and he responded in the negative. His wife appeared to not believe him and an argument ensued. In the morning, his wife refused to speak to him. Defendant decided that it was stressful and packed two or three articles of clothing and left home without telling his wife. He went to work but did not go home afterward and slept in the car for about two days. Then, he stayed with his uncle in New Orleans East for a few days until he found out that the police were looking for him.
Defendant explained that at first he was staying away from home in the hopes that his wife would miss him and ask him to return. However, when he realized that the police were looking for him, he became “scared.” Defendant explained that he did not understand why the police were involved in a family situation because in Vietnam it was something that was settled inside the family. Defendant spoke to many people and was told that if he lost his ease that he could die; and therefore, he was really “scarfed.” He had already quit his job because he had decided to move away and stay with a friend in the woods in order to show his wife that nothing happened with him and the victims. According to defendant, he quit his job before discovering that the police were looking for him. When shown 124his employee records indicating that he quit on May 14, defendant testified that those records were “very close to right.” When defendant discovered that the police were looking for him, he decided to run away and move out of town because it was better to live a little longer than to die. Defendant explained that he withdrew money from his IRA and gave everything to his wife to survive.
Defendant drove to Grand Junction, Colorado, to visit a friend, where he lived for about seven or eight years. He next moved to Las Cruces, New Mexico, and then to Farmington, New Mexico. Defendant admitted to calling and speaking to his wife several times while in Colorado and New Mexico.
While defendant was in Farmington, he bought an RV, and his wife came to stay with him because he had a heart attack. He and his wife then moved to California for a time, and then he moved back to New Mexico. Defendant then moved to Wyoming in 2010, and remained there until he was arrested in February or March of 2012.
According to defendant, he never had sexual intercourse with Nicole. He acknowledged that he used to work on cars at Carl’s house almost every weekend, usually on Saturdays. He explained that he worked when Carl was home because he was the only one with a key to the garage. According to defendant, he did not have sex with Nicole or Janet while their father was outside working on cars. Defendant also explained that it was not true that he *638 touched them throughout a long period of time. According to defendant, he did not place grapes in Nicole’s vagina. Defendant also denied using his mouth on Nicole or Janet. Defendant explained that according to Vietnamese customs, kissing is a terrible and dirty thing. Defendant testified that more than a month before the disclosure, Nicole told him that she was on James Street and three boys jumped down from a white van and pulled her into the van. According to defendant, he looked at her sadly, | ^and Nicole smiled and told him that it was alright because she liked one of the boys. Defendant denied doing any of the acts of which he was accused.
Defendant acknowledged that the girls would come to his house to go to church, which was located across from defendant’s house. He also acknowledged that his wife helped out at Alice’s wig shop, including on Saturdays. However, defendant testified that his wife took care of the girls, and he was always working on the automobiles. Therefore, he did not know when they came and left from his house. Defendant testified that he never watched the girls because he was busy, and from 1991 to 1999, he was never alone with them. Defendant did not know why Nicole said what she said. Defendant explained that when the girls were at defendant’s house, his wife would not go to the wig shop because she had to babysit. Defendant’s mother lived with him and she spent time on the couch and outside gardening. He explained that his mother did not help watch the girls when they came over.
Defendant admitted to having a pornographic magazine that was only for his use, but denied having a pornographic video. Defendant acknowledged owning a back massager that was big and heavy, but denied ever using it on the victims. According to defendant, he never slept with the girls. Defendant also stated that he did not consult a lawyer during the time he was still in the New Orleans area. Defendant explained that he believed the problem arose when Nicole had a boyfriend, did not want to stay home, and kept staying at other people’s houses, which caused defendant’s wife to worry. According to defendant, the girls were never alone at his house without his wife. Defendant did not offer a reason to explain why his wife testified that he had spent time alone with the girls. Defendant did, however, testify that he believed that his wife would do whatever |2fishe could to protect him. Defendant stated that he never showed any pornographic magazines to the victims, and he denied raping or molesting them.

DISCUSSION

In this appeal, defendant assigns three errors. First, defendant argues that his constitutional right to confront witnesses against him was violated by the admission of video-recorded interviews of Janet and Nicole without proof of strict compliance with the requirements of La. R.S. 15:440.1 et seq. Second, defendant argues the trial court erred by denying his motion for a new trial based on the prosecutor’s reference to defendant’s post-arrest exercise, upon the advice of counsel, of his right to remain silent. Third, defendant argues the trial court erred in denying his motion for a mistrial after the prosecutor made an improper reference to other crimes in the prosecutor’s rebuttal argument. For the following reasons, we find that defendant’s first and third assignments of error are without merit. While defendant’s second assignment of error has serious merit, we do not find that the trial court abused its discretion in the context of this case in denying defendant’s motion for new trial.

Assignment One

In his first assignment of error, defendant argues the trial court erred in admitting the recorded CAC interviews of *639 Janet and Nicole without strict compliance with La. R.S. 15:440.1, et seq. Specifically, defendant argues that the state failed to meet the requirement of La. R.S. 15:440.5(A)(6) that the “person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party.” The parties do not dispute that the “person conducting” Janet and Nicole’s CAC interviews, Ms. Gordon, was not “present at the proceeding” and not “available.” Defendant asserts that this requirement is not met because Pet. ^Broussard, who did testify at trial and who was subject to cross examination, was not a supervisor of the interviews. Defendant contends that this failure to adhere to the strict requirements of La. R.S. 15:440.1, et seq., violated his rights under the Sixth Amendment confrontation clause of the U.S. Constitution.
Under the relevant Louisiana law, certain audio and visual recordings of interviews of protected persons, such as the victims in this case, are admissible provided that certain requirements are met.[10] The requirements relevant to this appeal are as follows:
A. A videotape of a protected person may be offered in evidence either for or against a defendant. To render such a videotape competent evidence, it must be satisfactorily proved:
* * *
(5) That the taking of the protected person’s statement was supervised by a physician, a social worker, a law enforcement officer, a licensed psychologist, a medical psychologist, a licensed professional counselor, or an authorized representative of the Department of Children and Family Services.
B. The department shall develop and promulgate regulations on or before September 12, 1984, regarding training requirements and certification for department personnel designated in Paragraph (A)(5) of this Section who supervise the taking of the protected person’s statement.
La. R.S. 15:440.4
A. The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
* * *
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by either party; ...
La. R.S. 15:440.5
At the outset, it is clear that Det. Brous-sard is a law enforcement officer and is thus within a class of individuals which La. R.S. 15:440.4 permits to supervise a | ¡^recording of an interview of a protected person. State v. Guidroz, 498 So.2d 108, 110 (La.App. 5th Cir.1986) (stating “La. R.S. 15:440.4 B does not require that law enforcement officials be certified if they are to supervise the taking of the victim’s statement”). The statute requires that:
[E]ither the interviewer or the person supervising the interview be available to testify or to be cross-examined by either party. La. R.S. 15:440.5(A)(6). This statutory requirement serves the purpose of having a witness who can authenticate the video tape, and it serves *640 the purpose of having a witness to testify in regard to whether the process of recording and conducting the interview complied with the statutory requirements.
State v. Roberts, 42,417 (La.App. 2 Cir. 9/19/07), 966 So.2d 111, 123.
Furthermore, Louisiana courts have routinely found that officers who acted similarly to Det. Broussard were supervisors of protected-person interviews within the meaning of La. R.S. 15:440.5. See Id., and State v. Hawkins, 11-193 (La.App. 4 Cir. 11/16/11), 78 So.3d 293.
In Roberts, the defendant argued that the court erred in admitting a videotaped interview conducted pursuant to La. R.S. 15:440.1, et seq., because the state had not produced the interviewer as a witness and because the state did not prove that the detective who watched the interview was the supervisor of that interview. Roberts, 966 So.2d at 122. Similar to the current case, in Roberts, the supervising detective watched and listened to the interview via closed-circuit television in another room. “The interviewer was wearing an ‘ear bug1 ” which allowed the detective to communicate with the interviewer “to suggest questions or to let her know they could not hear what was being said.” Id. at 116. The state did not call the interviewer at trial; however, it called the detective who had listened to the interview.[11] While the Second Circuit did not reach the merits of this | ¡.^assignment because they found that the issue had not been preserved for appeal, that court nevertheless stated that it found “no merit to [the] Defendant’s contention that [the detective listening in the other room] did not actually supervise the interview or that she was not properly qualified to do so in accordance with the statute.” State v. Roberts, 42,417 (La.App. 2 Cir. 9/19/07), 966 So.2d 111, 122-23.
In State v. Hawkins, supra, the Fourth Circuit faced the same challenge to a similar interview of a child victim. In Hawkins, the detective was not in the interview room, but was fitted with an earpiece and a microphone that allowed her to directly communicate with the interviewer. The Fourth Circuit held that, even without the testimony of the interviewer, the testimony of the supervising detective was sufficient to satisfy La. R.S. 15:440.4(A)(5) and La. R.S. 15:440.5(A)(6). The court reasoned that the detective’s testimony as to whether the recorded interview adhered to the legal requirements served the purpose of the statutory requirement. The Hawkins court also found that the defendant’s right to confront the witnesses against him had not been violated.
Similar to the detectives in Roberts and Hawkins, in the present case, Det. Brous-sard testified that he observed and viewed the interviews of Janet and Nicole from a separate room as those interviews occurred. Detective Broussard had a microphone through which he communicated to Ms. Gordon via an “earpiece” at least twice. The first instance of this communication is observed at the time marked “10:02” on the recording. At that time, when a muffled and inaudible voice is heard on the recording, Ms. Gordon pauses. The second instance is observed at the time of “10:05” on the recording, when Ms. Gordon again pauses in her questioning. After both of these pauses, Ms. Gordon asks questions Unintended to clarify the victims’ prior answers.[12] In light of this *641 evidence, and applying the law and jurisprudence of this state, we find that Det. Broussard was the supervisor of the CAC interviews of Janet and Nicole within the meaning of La. R.S. 15:440.5(A)(6). In light of our finding that this provision was not violated, defendant’s argument that the violation of this law violated his rights under the confrontation clause of the U.S. Constitution also fails. Accordingly, we find this assignment of error to be without merit.[13]

Assignment Two

In his second assignment of error, defendant argues the trial court erred when it denied his motion for a new trial premised upon the prosecutor’s calculated reference to defendant’s post-arrest exercise of his privilege against self-incrimination. During Det. Broussard’s direct examination by the state, the following took place:
[In response to the state’s questioning of Det. Broussard regarding defendant’s actions after he had been extradited back to Jefferson Parish from Wyoming, defense counsel objected and asked for a bench conference where the following exchange took place:]
[Defense Counsel]: This [testimony] is going that he went down and talked to him, and he said, I have an attorney who’s advised me not to talk to you okay?
[Court]: Uh-huh.
[Defense Counsel]: And I don’t think that’s admissible. It was against his constitutional right. And it’s within his privilege not to — to remain silent. And I don’t think it can be used as evidence.
They’re presenting it as evidence. Since they don’t have a statement, they should stop.
| ai [Court]: You want him to testify as to what his attorney advised him?
[Prosecution]: No. I was just going to ask him if he was informed of his rights and if he was willing to give a statement.
[Defense Counsel]: And that — Right. And I don’t think you can do that. I don’t think that — He’s under no obligation to give that statement.
[Prosecution]: He’s informed of his rights, and he is cognizant of his rights, and he is taking advantage of the constitutional rights that he understands.
[Court]: I’m going to overrule the objection.
[Defense Counsel]: Note our objection. (End of bench conference.) [The prosecution resumes examination of Det. Broussard]
[Prosecution] Q. When you met with [defendant ... ], was he informed of his rights?
[Det. Broussard] A. He was advised of his rights, yes.
[Prosecution] Q. Did you do that?
[Det. Broussard] A. Yes, I did.
[Prosecution] Q. Did you need an interpreter?
[Det. Broussard] No, no.
[Prosecution] Q. Did he indicate to you that he understood his rights?
[Det. Broussard] A. He understood his rights, yes.
[Prosecution] Q. Okay. Did he agree to give you a statement?
*642 [Det. Broussard] A. No. After I told him that I wanted to talk — after I advised him of his rights, I wanted to talk to him of his rights, I wanted to talk to him about the charges, he immediately told me that he and his family had secured an attorney, Bruce Netterville. And he told me that his attorney told — advised not to talk to me. I then stopped whatever I — I didn’t interview. I didn’t ask him anymore questions. And I left.
[sJn his closing argument, the prosecutor returned to the matter of defendant’s retention of an attorney and post-arrest exercise of his right to remain silent, stating:
Really? You know why he left; because he knew he was guilty. He didn’t want to be punished.
What else did he do when he was on the run? Henry Tony; that’s his alias, one of abases he used. If he was so innocent, why use an alias? He didn’t talk to a lawyer. However, when he was arrested in Wyoming, when the police went to go interview him at the jail here, he had a lawyer before they even got there. So at some point, over the 13 years that he was gone, he did learn about the legal system. Did he call anybody down here? Did he turn himself in? No. He stayed on the run until he was caught. That’s what he did because he is guilty. That’s why he fled.
Defense counsel entered a timely objection to the above state questioning of Det. Broussard and filed a motion for new trial on June 17, 2013. Defense counsel supplemented his motion for a new trial on June 18, 2013. In this supplemental motion for a new trial, defense counsel argued “[t]he court erred when it allowed the state to elicit testimony that the defendant refused to make a statement on advice of counsel.” First, we find this assignment of error is properly preserved for appeal. Second, we find that the trial court clearly erred in allowing the state to question Det. Broussard regarding the defendant’s exercise of his right to remain silent. The state compounded this error when they referenced defendant’s exercise of his Fifth Amendment Constitutional rights during closing arguments.

Standard of Review

Under La.C.Cr.P. art. 851(2), the trial court shall grant a new trial whenever “[t]he court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.” According to La.C.Cr.P. art 851, a new trial motion “is based on the supposition that injustice has been done the defendant, l^and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.”
The denial of a motion for a new trial is not subject to appellate review except for an error of law. La.C.Cr.P. art. 858. Further, the ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of that discretion. State v. Bibbins, 13-875 (La.App. 5 Cir. 4/9/14), 140 So.3d 153; State v. Gerard, 96-366 (La.App. 5 Cir. 11/14/96), 685 So.2d 253, 260. The merits of a motion for a new trial must be viewed with extreme caution in the interest of preserving the finality of judgments. Id.; see also State v. Rodriguez, 02-334 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 133, writ denied, 03-0482 (La.5/30/03), 845 So.2d 1061, cert. denied, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).

Analysis

*643 In Doyle v. Ohio[14], the United States Supreme Court held that reference to a defendant’s silence at the time of his arrest for impeachment purposes violates his due process rights.[15] Even in cases where a defendant does not testify in his own defense, it is improper to reference the fact that an accused exercised his right to remain silent to ascribe a guilty meaning to his silence or to undermine, by inference, an exculpatory version of events related by the accused. State v. Pierce, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1272; State v. Montoya, 340 So.2d 557 (La.1976).
In State v. George, the Louisiana Supreme Court explained:
laiThis court has expressed its disapproval of placing before the jury evidence that the police advised the defendant of his Miranda rights at the time of his arrest when the testimony does not establish a predicate for admitting a subsequent oral or written inculpatory statement and thereby invites jurors to consider the defendant’s post-arrest silence as an impeachment of an exculpatory account later offered at trial. State v. Mosley, 390 So.2d 1302 (La.1980); Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
State v. George, 95-0110 (La.10/16/95), 661 So.2d 975, 979.

Harmless Error

Doyle violations are characterized as trial errors, and are subject to harmless error analysis. See State v. Alas, 622 So.2d 836, 837 (La.App. 5 Cir.1993) writ denied, 629 So.2d 397 (La.1993); State v. Olivieri, 03-563 (La.App. 5 Cir. 10/28/03), 860 So.2d 207, 215; State v. Longo, 08-405 (La.App. 5 Cir. 1/27/09), 8 So.3d 666, 674.
Here, where there was an objection to the testimony of Det. Broussard on this point at a bench conference before Det. Broussard testified on this point, we cannot say that the prosecutor unwittingly fell into pursuing an unconstitutional line of questioning. Furthermore, the fact that the prosecutor referred to defendant’s silence again in closing argument indicates a clear intent to pursue the line of questioning. While a brief reference to a defendant’s post-arrest silence does not in every case require reversal, it is not permissible for the prosecutor to intentionally thread the needle by impermissibly laying before the jury a defendant’s post-arrest silence and then carefully moving away to another line of questioning.
While this Court has consistently held that “a brief reference to post-Miranda silence does not mandate a mistrial or reversal where the trial as a whole was fairly conducted, the proof of guilt is strong, and the state made no use of the silence for impeachment purposes”, this analysis does not apply where the | sr,prosecutor stresses or emphasizes the defendant’s silence at trial. Pierce, supra, State v. Campbell, supra; See also State v. Smith, 336 So.2d 867 (La.1976). (Compare to cases in which post-arrest silence was stressed or emphasized at trial: State v. Grant, 99-1065 (La.App. 5 Cir. 1/25/00), 761 So.2d 10,12-14 (wherein the defendant was repeatedly asked at trial why he didn’t “talk to anybody else ... when you [the *644 defendant] first got arrested”), and State v. Montoya, 340 So.2d at 562 (wherein the prosecutor implicitly referenced the defendant’s failure to testify at trial, argued at trial that the defendant had to “explain his possession [of stolen property],” and where additional errors further compounded a state witness’ reference to the defendant’s post-arrest silence)).
However, the evidence of the defendant’s guilt in this case is particularly overwhelming. Both victims knew their attacker personally and gave clear and detailed recorded statements during the time period in which their attacks occurred. As adults, both victims testified to the past abuse in question. The jury was able to compare their adult testimony with their video statements as children. Furthermore, several family members and the defendant’s employer were able to corroborate the circumstances surrounding the abuse. The evidence in this case is extraordinarily strong. Therefore, in the context of this particular case, we cannot say that the trial court erred in denying the motion for mistrial.
In this case, the prosecutor’s questions to Det. Broussard regarding defendant’s exercise of his Fifth Amendment privilege against self-incrimination on the advice of counsel were improper and impermissible. Likewise, the trial court’s ruling overruling defense counsel’s objection to this impermissible line of questions was also clearly in error. See State v. Kersey, 406 So.2d 555, 560 (La.1981); State v. Smith, 336 So.2d 867, 868 (La.1976); State v. Montoya, 340 So.2d at 560. As stated above, the prosecutor compounded this error in closing ^argument. Defendant’s conviction stands only because we find defendant’s post-arrest silence was not stressed or emphasized throughout the entirety of the trial, and the trial as a whole was fairly conducted and there was patently overwhelming proof of guilt. See State v. Pierce, 80 So.3d at 1272; State v. Campbell, 97-369 (La.App. 5 Cir. 11/25/97), 703 So.2d 1358, 1361; State v. Smith, 336 So.2d at 869.
Although Det. Broussard testified regarding his further investigation after defendant invoked his right to be silent, there was no necessity for Det. Broussard to testify to this invocation of silence to explain the next steps in his investigation. While we clearly disapprove this improper line of questioning designed to elicit inadmissible evidence, we do not find the error warrants reversal nor a new trial under the unusually strong evidence presented in this particular case. See State v. Pierce, 80 So.3d at 1272; State v. Campbell, 97-369 (La.App. 5 Cir. 11/25/97), 703 So.2d 1358, 1361; State v. Smith, 336 So.2d at 869. Accordingly, we find that this clear error did not, in this particular case, mandate that the trial court grant a new trial.

Assignment Three

In his third assignment of error, defendant argues the trial court erred in failing to grant his June 17, 2013 motion for a mistrial premised upon the prosecutor’s improper reference to other crimes evidence in his rebuttal argument. Specifically, defendant argues the prosecutor im-permissibly asked the jury to consider the evidence of other crimes when, in his rebuttal to defendant’s closing argument, he made two statements. First, the prosecutor stated:
You know, this trial, we’re in day three of this trial, and there’s been a lot of tears from this witness stand, a lot of tears in a lot of unexpected places; because there’s more victims in this case. There’s Mary, his wife. I don’t know about you. Mary’s a victim.
[[Image here]]
[The love between defendant and his wife, Mary,] is strong [....] But you *645 know what breaks love? You know what’s stronger than that |S7love? The truth, the truth about what happens to innocent little girls. They both said that she looked at these girls almost as if she was their own mother.... And that’s why she got on the stand and she told you the truth.
[[Image here]]
She told you the pain that it has caused her, the pain that it has caused her entire family. And she — I said in the last question I asked her as she was crying, she was sobbing here in front of you, saying “I wish,” you know, ‘I’m sorry, I wish.’ I said, ‘It’s not your fault.’ I said, You didn’t cause this pain. The girls didn’t cause this pain. [Alice] didn’t cause this pain.’ I said, ‘Whose fault is all of this?’ She couldn’t even ‘Him, him,’ is what she said; because he’s had many victims in his life, more than just the two girls.
At this point, defense counsel objected to what he perceived as the prosecution’s reference to other crimes. The prosecutor argued to the court that he was simply making reference to other “emotional” •victims of defendant’s actions. The trial court allowed the prosecutor to clarify this point to the jury, at which point, the prosecutor then stated to the jury:
There are multiple victims in this case. And no, Mr. Netterville, I’m not talking about physical victims; I’m talking about victims of suffering, victims of emotional abuse. There are only two women in this room that we know of that he has physically abused.
Defense counsel again objected on the grounds that the prosecutor was implying to the jury that defendant had physically abused other victims. The trial court sustained defense counsel’s objection. At a bench conference which immediately followed, defense counsel argued that the prosecutor’s reference to other crimes was impermissible and moved for a mistrial. The trial court denied defense counsel’s motion for mistrial, stating:
I don’t think that the statement that ‘there are no other victims that we know of says that there are other victims out there. In fact, it says we don’t know. And I’m going to make — I will do an instruction to the jury that there is no evidence of other victims and they are not to consider that. And I think that his argument was, if I understood it correctly, that there are other victims in the family.... Any emotional victims.... Not victims of sexual abuse. So I’ll ask that [the prosecutor] clarify that.
IssThe trial court then instructed the jury that it was to disregard the prosecutor’s statement “that there are other victims that we know of’ and allowed the prosecutor to continue his rebuttal argument. In the portion of his rebuttal argument that followed, the prosecutor explained to the jury, “there are victims that we do know of.... there’s Mary.... There’s [Carl], a hard working father, [and ... Alice, who is] also another victim in this case.”[16]
La.C.Cr.P. art. 775 provides for a mistrial if prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized under La.C.Cr.P. arts. 770 or 771.[17] A mistrial under La.C.Cr.P. *646 art. 775 is discretionary and is warranted only when trial error results in substantial prejudice to the defendant depriving him of a reasonable expectation of a fair trial. State v. Davis, 07-544 (La.App. 5 Cir. 12/27/07), 975 So.2d 60, 68, writ denied, 08-380 (La.9/19/08), 992 So.2d 952.
La.C.Cr.P. art. 770 provides in pertinent part that:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during trial or in argument, refers directly or indirectly to:
[[Image here]]
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible.
[[Image here]]
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish |S9the jury to disregard the remark or comment but shall not declare a mistrial.
A mistrial is a drastic remedy and is warranted only when trial error results in substantial prejudice to a defendant that deprives him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Lagarde, 07-123 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, 1113-14, writ denied, 07-1650 (La.5/9/08), 980 So.2d 684.
Louisiana Code of Criminal Procedure article 770, subsection 2, is not applicable unless the inference clearly constitutes a comment on other crimes committed or alleged to have been committed by the defendant. State v. Rhodes, 95-54, p. 4 (La.App. 5 Cir. 6/28/95), 657 So.2d 1373, 1376-77, writ denied, 95-2265 (La.3/14/97), 690 So.2d 28. Here, there was no distinct or recognizable reference to any other crime. After examining the prosecutor’s remarks in context, it is clear that he referenced the emotional victims in the family and not other sexual abuse victims. See Rhodes, 657 So.2d at 1377; and State v. Blueford, 48,823, at 6-7 (La.App. 2 Cir. 3/5/14), 137 So.3d 54. The prosecutor’s comment was not a reference to other crimes but merely misspoken words regarding defendant’s emotional victimization of the family that were corrected. The prosecutor’s comment was explained and corrected, and did not contribute to the jury finding defendant guilty. State v. Daniels, 01-545 (La.App. 5 Cir. 11/27/01), 803 So.2d 157, 166, writ denied, sub. nom State ex rel. Daniels v. State, 02-215 (La.App. 5 Cir. 11/27/02), 831 So.2d 272. We find that the trial court did not abuse its discretion in denying defendant’s motion for a mistrial on this ground. See State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232, 1244 writ \ ^denied sub nom. State ex rel. Chairs v. State, 2013-0306 (La.6/21/13), 118 So.3d 413. Accordingly, *647 we find this assignment of error to be without merit.

ERRORS PATENT

We have reviewed the record for errors patent in conformity with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The record reflects two errors patent which require corrective action.
First, the record does not reflect that defendant was notified of Louisiana’s sex offender registration requirements in accordance with La. R.S. 15:540, et seq. Defendant was convicted of aggravated rape upon Nicole, committed between December 13, 1991, and December 12, 1997; attempted aggravated rape upon Janet, committed between November 20, 1992, and November 19, 1998; molestation of a juvenile upon Nicole committed between December 13,1991, and May 17,1999; molestation of a juvenile upon Janet, committed between November 20, 1992, and May 17, 1999; and aggravated oral sexual battery upon Janet, committed between November 20,1992, and November 19,1998. See La. R.S. 15:542(E).
La. R.S. 15:540, et seq., requires registration of sex offenders and La. R.S. 15:543(A) requires the trial judge to provide written notification of the registration requirements of La. R.S. 15:542 and La. R.S. 15:542.1 to defendant. The trial court’s failure to provide this notification constitutes an error patent and warrants a remand for written notification. State v. Lampkin, 12-391 (La.App. 5 Cir. 5/16/13), 119 So.3d 158, 168 writ denied sub nom. State ex rel. Lampkin v. State, 2013-2303 (La.5/23/14), 140 So.3d 717 (citing State v. Pierce, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1279-80). This is the case even where a life sentence has been imposed. State v. Videau, 13-520 (La.App. 5 Cir. 12/27/13), 131 So.3d 1070, 1089, (citing State v. Williams, 09-48 (La.App. 5 Cir. 10/27/09), 28 So.3d 357, 368-69, writ denied, 09-2565 (La.5/7/10), 34 So.3d 860).
Accordingly, we remand the matter to the trial court for purposes of providing defendant with appropriate written notice of his sex offender notification and registration requirements, using the form contained in La. R.S. 15:543.1.
Second, the “State of Louisiana Uniform Commitment Order,” incorrectly reflects the date of defendant’s offenses as March 7, 2012. However, the record reflects that there were multiple offense dates between 1991 and 1999. The practice of this Court is to remand a case for correction of the Uniform Commitment Order in its error patent review when the Uniform Commitment Order is inconsistent with the minute entry and transcript. See State v. Long, 12-184 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142. Accordingly, we remand this matter for correction of the Uniform Commitment Order error regarding the offense dates and further direct the Clerk of Court to transmit the original of the Uniform Commitment Order to the officer in charge of the institution to which defendant has been sentenced and the Department of Correction’s Legal Department. See Id. (citing La. C.Cr.P. art. 892(B)(2); and State ex rel. Roland v. State, 06-224 (La.9/15/06), 937 So.2d 846 (per curiam)).

CONCLUSION

For the reasons assigned, defendant’s convictions and sentences are affirmed. The matter is remanded to the trial court for compliance with the instructions set forth in our errors patent review.

AFFIRMED; REMANDED WITH INSTRUCTIONS.

. Before this indictment, on March 27, 2012, a preliminary hearing was held and the trial court determined that probable cause existed to hold defendant.

. See La.Rev.Stat. Ann. § 46:1844(W)(3)

. Nicole did not indicate that she saw defendant touch Janet. Nicole did not explain how she knew that defendant had also touched Janet. It is further noted that Janet stated in her own CAC interview that the first person she disclosed the incidents to was Nicole.

. After the trial court played these recorded interviews for the jury, the trial court admitted the drawings that Janet produced during her interview as State's Exhibits 15 and 16.

. Det. Broussard also testified that at the time of this initial investigation in 1999, he did not take any clothing or DNA samples from the victims because he did not believe he would have found any useful evidence given the two-month period between the last reported incident and the date Det. Broussard came to learn of the incidents.

. Janet testified that defendant’s mother was always at defendant’s house, including during the incidents when defendant sexually molested and raped her.

. Nicole claimed that there were a “few times” when defendant molested her and one instance when defendant had sexual intercourse with her at her father’s house.

. The child abuse program forensic medicine referrals and reports for Janet and Nicole were admitted as State’s Exhibits 18 and 19.

. On cross-examination, Dr. Benton admitted that he had no independent recollection of his examination of Janet and Nicole. Dr. Benton’s trial testimony was based on his medical reports on Janet and Nicole which he believed were accurate.

. For purposes of this analysis " ‘protected person’ means any person who is a victim of a crime or a witness in a criminal proceeding and who is either of the following: (1) Under the age of seventeen years. (2) Has a developmental disability as defined in R.S. 28:451.2(12)." La. R.S. 15:440.2(C).

. The state also called the child-victim interviewee as a witness. Roberts, 966 So.2d at 115.

. Presumably, this was done at the instruction of Det. Broussard.

. In Guidroz, supra, this Court held that the trial court did not err in admitting a recorded interview of a protected person. This Court also found that where the defendant viewed the videotape prior to trial, the victim was called to testify after showing of the videotape, and the defendant was able to conduct a meaningful cross-examination, then the admission of the recorded interview into evidence did not violate the defendant’s constitutional rights under the Sixth Amendment's Confrontation Clause.

. 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

. The Supreme Court explained, "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested_ it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.” Doyle v. Ohio, 426 U.S. at 617-18, 96 S.Ct. at 2244-45.

. In the omitted portion of this quote, the prosecutor explained how each of these individuals was victimized by defendant’s actions against Janet and Nicole.

. Under La.C.Cr.P. art. 771, a mistrial is discretionary when a comment is made by, inter alia, a district attorney that might prejudice the defendant when that comment is *646 outside of the scope of La.C.Cr.P. art. 770. Article 771 gives the trial court the option to either admonish the jury, upon motion of the defendant, or, if an admonition does not appear sufficient, to declare a mistrial. State v. Johnson, 10-209 (La.App. 5 Cir. 10/12/10), 52 So.3d 110, 124, writ denied, 10-2546 (La.4/1/11), 60 So.3d 1248. A mistrial should be granted under Article 771 only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Thomas, 08-390 (La.App. 5 Cir. 1/27/09), 8 So.3d 80, 86-87, writ denied, 09-626 (La.11/25/09), 22 So.3d 170; State v. Pierce, 11-320 (La.App. 5 Cir. 12/29/11), 80 So.3d 1267, 1271-72.